No. 22-50144

# In the United States Court of Appeals for the Ninth Circuit

---

UNITED STATES OF AMERICA,
APPELLEE

*v.*

JEFFREY FORTENBERRY,
DEFENDANT-APPELLANT

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA (CRIM. NO. 21-491)*
*(THE HONORABLE STANLEY BLUMENFELD, JR., J.)*

---

**BRIEF OF APPELLANT**

---

GLEN E. SUMMERS
BARTLIT BECK LLP
  *1801 Wewatta Street, Suite 1200*
  *Denver, CO 80202*

JOHN L. LITTRELL
BIENERT KATZMAN
  LITTRELL WILLIAMS LLP
  *903 Calle Amanecer, Suite 350*
  *San Clemente, CA 92673*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

JING YAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

# TABLE OF CONTENTS

Page

Statement of jurisdiction.........................................................................1

Statement of the issues ...........................................................................1

Statement of the case ..............................................................................1

    A.    Background .................................................................5

    B.    Proceedings below................................................12

Summary of argument .........................................................................16

Standard of review.................................................................................21

Argument................................................................................................22

    I.    Venue was improper in the Central District of California ..........22

        A.    The Constitution requires a prosecution to proceed
            in the venue where the crime was committed ....................22

        B.    The proper venue for a Section 1001 prosecution is
            the location where the false statement was made...............26

        C.    The district court erred by adopting an
            effects-based test for determining venue
            for Section 1001 prosecutions.................................................31

        D.    The special venue statute for continuing offenses
            does not apply........................................................................37

    II.    The jury instruction on materiality constituted
        an incomplete statement of the law.................................................41

        A.    A statement is not 'material' merely because
            it could cause the government to investigate
             the truth of the statement itself ...........................................42

        B.    Adopting a broad reading of materiality
            would raise serious constitutional concerns ......................46

        C.    The district court erred by declining to give
            Congressman Fortenberry's jury instruction
            on materiality .......................................................................48

(i)

Page

Table of contents—continued:

    D.    Vacatur is required to remedy
           the instructional error ........................................................51

Conclusion...............................................................................................55

## TABLE OF AUTHORITIES

### CASES

*Brogan* v. *United States*, 522 U.S. 398 (1998).....................................20, 47 49, 50

*De Rosier* v. *United States*, 218 F.2d 420 (5th Cir. 1955) ................................38

*Griffin* v. *United States*, 502 U.S. 46 (1991) ....................................52, 53, 55

*Johnston* v. *United States*, 351 U.S. 215 (1956) ...............................23, 27

*Kelly* v. *United States*, 140 S. Ct. 1565 (2020) .....................................47

*Kolender* v. *Lawson*, 461 U.S. 352 (1983)..........................................46

*Kungys* v. *United States*, 485 U.S. 759 (1988)......................................42

*McDonnell* v. *United States*, 136 S. Ct. 2355 (2016).........................................47

*Sessions* v. *Dimaya*, 138 S. Ct. 1204 (2018)........................................46

*Skilling* v. *United States*, 561 U.S. 358 (2010)....................................47

*Travis* v. *United States*, 364 U.S. 631, 636 (1961) ...............................38

*United States* v. *Acosta-Gallardo*,
    656 F.3d 1109 (10th Cir. 2011).....................................................29

*United States* v. *Anderson*, 328 U.S. 699 (1946)..............................23, 33, 35, 36

*United States* v. *Angotti*, 105 F.3d 539 (9th Cir. 1997)................................39, 40

*United States* v. *Atalig*, 502 F.3d 1063 (9th Cir. 2007)......................................27

ii

Page

Cases—continued:

*United States* v. *Auernheimer*, 748 F.3d 525 (3d Cir. 2014)..............................37

*United States* v. *Barona*, 56 F.3d 1087 (9th Cir. 1995)...............................52, 55

*United States* v. *Borrero*, 771 F.3d 973 (7th Cir. 2014) .....................................52

*United States* v. *Cabrales*, 524 U.S. 1 (1998) ..............................................*passim*

*United States* v. *Camick*, 796 F.3d 1206 (10th Cir. 2015) ...............................43

*United States* v. *Castillo-Mendez*, 868 F.3d 830 (9th Cir. 2017) .....................52

*United States* v. *Coplan*, 703 F.3d 46 (2d Cir. 2012)..........................................35

*United States* v. *Corona*, 34 F.3d 876 (9th Cir. 1994).......................................38

*United States* v. *Culliton*, 328 F.3d 1074 (9th Cir. 2003) .................................50

*United States* v. *Davis*, 139 S. Ct. 2319 (2019) ....................................................46

*United States* v. *Gaudin*:

    28 F.3d 945 (9th Cir. 1994)....................................................................*passim*

    515 U.S. 506 (1995)........................................................................43, 45, 49

*United States* v. *Hsiung*, 778 F.3d 738 (9th Cir. 2015)......................................21

*United States* v. *John*, 477 Fed. Appx. 570 (11th Cir. 2012)......................29, 30

*United States* v. *Johnson*, 19 F.4th 248 (3d Cir. 2021)............................*passim*

*United States* v. *Johnson*, 323 U.S. 273 (1944).................................................25

*United States* v. *Johnson*, 530 F.2d 52 (5th Cir. 1976)......................................29

*United States* v. *Leon-Reyes*, 177 F.3d 816 (9th Cir. 1999) .............................50

*United States* v. *Litvak*, 808 F.3d 160 (2d Cir. 2015)................................*passim*

Page

Cases—continued:

*United States* v. *Lozoya*, 982 F.3d 648 (9th Cir. 2020) ......................................23

*United States* v. *Marsh*, 144 F.3d 1229 (9th Cir. 1998) ...............................40, 41

*United States* v. *Matanky*, 482 F.2d 1319 (9th Cir. 1973)...............................51

*United States* v. *Moore*, 612 F.3d 698 (D.C. Cir. 2010) ....................................47

*United States* v. *Oceanpro Industries, Ltd.*,
    674 F.3d 323 (4th Cir. 2012)........................................................................35, 37

*United States* v. *Renzi*, 769 F.3d 731 (9th Cir. 2014)....................................22

*United States* v. *Ringer*, 300 F.3d 788 (7th Cir. 2002)..............................33, 34

*United States* v. *Rodriguez-Moreno*, 526 U.S. 275 (1999) ......................*passim*

*United States* v. *Service Deli Inc.*, 151 F.3d 938 (9th Cir. 1998)...............29, 50

*United States* v. *Smith*, 198 F.3d 377 (2d Cir. 1999)........................................37

*United States* v. *Smith*, 641 F.3d 1200 (10th Cir. 2001) .............................28, 29

*United States* v. *Stephenson*, 895 F.2d 867 (2d Cir. 1990) ...............................38

*United States* v. *Yermian*, 468 U.S. 63 (1984) ...........................................30, 48

*Yates* v. *United States*, 574 U.S. 528 (2015) .......................................................47

## CONSTITUTION, STATUTES, AND RULE

U.S. Const.:

    Art. III ...................................................................................................18

    Art. III, § 2 .............................................................................................23

    Art. III, § 2, cl. 3 ...................................................................................32

    Amend. 6 ............................................................................................18, 24

Page

Statutes and rule—continued:

18 U.S.C. § 924(c)(1) ...................................................................25

18 U.S.C. § 1001 ................................................................. *passim*

18 U.S.C. § 1001(a) .......................................................................13

18 U.S.C. § 1001(a)(1) ............................................12, 18, 27, 42

18 U.S.C. § 1001(a)(2) ............................................12, 18, 27, 42

18 U.S.C. § 1014 ...........................................................................39

18 U.S.C. § 1030(a)(5)(C) ...........................................................37

18 U.S.C. § 1512(i) .......................................................................36

18 U.S.C. § 1951(a) .......................................................................37

18 U.S.C. § 3231 .............................................................................1

18 U.S.C. § 3237(a) ................................................................37, 38

28 U.S.C. § 1291 .............................................................................1

52 U.S.C. § 30122 ...........................................................................6

52 U.S.C. § 30131 ...........................................................................6

Federal Rule of Civil Procedure 18 ..........................................24

## MISCELLANEOUS

William Blackstone, Commentaries ...........................................42

Ninth Circuit Model Criminal Jury Instructions.....................27

## STATEMENT OF JURISDICTION

The district court entered final judgment on June 28, 2022. *See* 1-ER-2. Appellant filed a notice of appeal on June 29, 2022. *See* 9-ER-2099. The jurisdiction of this Court rests on 28 U.S.C. § 1291. The district court had jurisdiction under 18 U.S.C. § 3231. Appellant did not receive a custodial sentence and thus is neither in custody nor on bail release. *See* 2-ER-164.

## STATEMENT OF THE ISSUES

1. Whether venue was improper in the Central District of California.

2. Whether the district court erred by failing to instruct the jury that a false statement is not material for purposes of 18 U.S.C. § 1001 merely because it causes the government to investigate the truth of the statement itself.

## STATEMENT OF THE CASE

This case involves an unprecedented prosecution in which the Department of Justice hauled a sitting member of Congress across the country to stand trial in a foreign jurisdiction on charges of making false statements more than a thousand miles away. Federal agents directed an informant to call appellant Jeffrey Fortenberry—then a congressman representing the first district of Nebraska—and make statements suggesting that illegal donations had been made to his campaign without his knowledge. The government then interviewed the Congressman and prosecuted him on the basis of the statements made in those interviews about the very call they orchestrated. Despite the fact that the Congressman made the relevant statements in Nebraska and

(1)

California.  And although the Congressman's statements misled no one, the district court allowed the jury to find that the statements were material based on the circular theory that the statements triggered a further investigation into the truth of those very statements.

In 2017, after a years-long investigation into a suspected conspiracy to make illegal contributions to multiple political campaigns, one of the targets of the investigation—Dr. Elias Ayoub—began cooperating with the investigation.  Among other things, Dr. Ayoub admitted that he and several of his family members had donated money he received from a foreign national to several federal campaigns, including to Congressman Fortenberry's campaign at a fundraising event in 2016.

Congressman Fortenberry did not know the true source of those funds. But in 2018, when he reached out to Dr. Ayoub to see if he would be willing to host another fundraiser, the government instructed Dr. Ayoub to place a phone call to the Congressman and to make statements suggesting the Congressman's campaign had received illegal contributions at the 2016 fundraiser. At the government's direction, Dr. Ayoub told the Congressman that the fundraiser likely would not raise as much money this time because, at the earlier fundraiser, he had been given $30,000 "cash" to help with his campaign, which "probably" came from a foreign national named Gilbert Chagoury.

Nine months later, government agents appeared unannounced at Congressman Fortenberry's home in Nebraska to conduct an interview. The agents initially represented that they were from the Omaha office of the Federal Bureau of Investigation (FBI), but they were actually from Los Angeles. The agents wanted to interview the Congressman to test his credibility; in the internal memorandum seeking approval for the interview, the lead FBI agent expressly noted that the Congressman may be charged for making false statements. Stating they were conducting a "background investigation" with a "national security" aspect, the agents persuaded the Congressman to allow them to enter his home at night to answer their questions. During the interview, the agents asked him whether he was "aware" of any foreign or conduit contributions to his campaign. He said that he was not; he attempted to bring up a "comment" to that effect from his call with Dr. Ayoub, but the conversation turned to other topics. The Congressman also noted that all the contributions to his campaigns were publicly disclosed in his reports to the Federal Election Commission.

Several months later, Congressman Fortenberry agreed to participate in a second interview with federal agents in Washington, D.C. Once again, he denied knowledge of foreign or conduit contributions to his campaign and stated that he had reported all donations on his campaign filings. Once again,

however, he noted that Dr. Ayoub had made a concerning comment to the effect that contributions at any future fundraiser would not be as large because Gilbert Chagoury would not be involved. The Congressman made clear that this comment was concerning to him because Mr. Chagoury was a foreign national.

Based on those statements, the government charged Congressman Fortenberry with three counts of false statements under 18 U.S.C. § 1001. Despite the fact that he made the relevant statements during in-person interviews in Nebraska and Washington, D.C., the government brought its indictment in the Central District of California. The case was tried there over the Congressman's objection, and he was convicted on all counts.

Congressman Fortenberry's convictions cannot stand for two reasons. *First*, venue was improper in the Central District of California. Venue for a criminal prosecution is proper only in the State and district in which the defendant committed the acts that constitute the alleged crime. And here, those acts were the statements that were communicated and received during in-person interviews in Nebraska and Washington, D.C. *Second*, the district court gave inadequate jury instructions that did not appropriately define the element of materiality for purposes of Section 1001. The instructions permitted the jury to convict the Congressman based merely on the capacity of the state-

ments to cause the government to investigate the truth of those same statements. But other courts of appeals have rejected that limitless theory of materiality, and sanctioning it here would render that crucial element effectively meaningless. For each of those reasons, the Congressman's convictions should be vacated.

### A.    Background

1.    Appellant Jeffrey Fortenberry served as a Republican member of Congress representing Nebraska's first district for nearly twenty years. *See* D. Ct. Dkt. 207, at 21 (presentence report). Before his election to Congress, he served on the Lincoln City Council for four years. *See id*. A congressional colleague from the Democratic Party described him at trial as a "deeply devoted husband and father, a man dedicated to service to others, a person who possesses humility and integrity, and a person who is devoid of arrogance." 2-ER-180. A former chief probation officer who knows the Congressman stated that he has "never met a more honorable, honest, dedicated and caring man, son, husband, father and committed representative of his constituents, community and country." 2-ER-182.

Congressman Fortenberry's tenure in Congress was marked by a deep concern for human rights, particularly those of persecuted religious minority groups. In connection with his work advocating for religious minorities around

the world, *see* 3-ER-472, the Congressman became acquainted with a non-profit known as In Defense of Christians, which advocates for Christian minorities in the Middle East, and its founder and president, Toufic Baaklini. 5-ER-805, 5-ER-811. The Congressman also met Gilbert Chagoury, an affluent foreign national who provided financial support to In Defense of Christians and other efforts to protect religious minorities in the Middle East. 5-ER-827–28, 5-ER-830–31. Elias Ayoub, an American citizen, physician, and honorary board member of the organization, briefly introduced himself to the Congressman at two of the organization's events. 5-ER-1050–53.

In 2016, In Defense of Christians organized a series of events for Congressman Fortenberry in Los Angeles. *See* 3-ER-473; 6-ER-1124, 6-ER-1128–32. A fundraiser was held on the evening of February 20, 2016, at a Los Angeles home. 4-ER-656. The Congressman's campaign received $36,000 in contributions, all of which were paid by check and disclosed to the Federal Election Commission. 5-ER-1002–03, 5-ER-1022. Unbeknownst to the Congressman, however, $30,000 of those contributions had been provided by Mr. Chagoury to Mr. Baaklini, who in turn provided funds to Dr. Ayoub to reimburse other fundraiser attendees who made individual contributions to the Congressman's campaign. 8-ER-1937, 8-ER-1976–77. Federal election law prohibits foreign nationals from contributing directly or indirectly to a campaign for federal, state, or local office. *See* 52 U.S.C. §§ 30122, 30131. The

following day, the Congressman attended a Maronite mass with the community and a gala luncheon, at which he received a knighthood in the Order of Saint Gregory, an honor bestowed by the Vatican for extraordinary service. 4-ER-656.

Also unbeknownst to Congressman Fortenberry, since 2015, the government had been investigating persons affiliated with In Defense of Christians, including Mr. Chagoury, Mr. Baaklini, and Dr. Ayoub, for potential violations of federal election laws. 4-ER-530–31, 4-ER-536, 4-ER-546–547. That investigation had uncovered several illegal contributions like those made to the Congressman, including to Mitt Romney's 2012 presidential campaign and Darrell Issa's 2014 congressional campaign. 4-ER-537–38.

Dr. Ayoub was eventually confronted by the FBI and began cooperating with the investigation. 4-ER-561–65. In 2018, Congressman Fortenberry contacted Dr. Ayoub about the possibility of hosting another fundraiser for him in Los Angeles, and Dr. Ayoub informed the government about that request. 4-ER-596–97. An initial call between the Congressman and Dr. Ayoub, recorded by the FBI, was uneventful; the Congressman said nothing to suggest he had any knowledge of the illegal nature of the contributions made to his campaign in 2016. 5-ER-1097–1103; 6-ER-1105. The government then in-

structed Dr. Ayoub to call the Congressman again and make certain statements suggesting that the Congressman's campaign had received illegal contributions at the 2016 fundraiser. 4-ER-599–602, 4-ER-606–10.

Dr. Ayoub placed the call to the Congressman's mobile phone on the morning of June 4, 2018. 4-ER-687, 4-ER-698. During the call, an agent from the FBI sat next to Dr. Ayoub, listened to and recorded the call, and guided Dr. Ayoub about what to say using a list of discussion topics. *See* 4-ER-609-610, 4-ER-653; 9-ER-2060. At the agent's request, Dr. Ayoub told the Congressman that he could host another fundraiser but that "we won't be able to donate as much money as we did last time" because Mr. Baaklini had given Dr. Ayoub $30,000 in "cash" to give to the campaign. 4-ER-610; 9-ER-2062. Although the Congressman's campaign received no cash at the fundraiser, the lead FBI agent testified that he instructed Dr. Ayoub to emphasize the term "cash." 4-ER-610. The Congressman assured Dr. Ayoub that "there would be no expectation of the types of funds that were there last time" and that he was thinking of a "small, more intimate" setting for the fundraiser. 9-ER-2062. Dr. Ayoub then told the Congressman that "probably the money did come from Gilbert Chagoury . . . because he was so grateful for your support." 9-ER-2063. The Congressman responded by speaking about the work he was doing in Congress to provide funding for rebuilding Christian communities in the Middle East. 9-ER-2064. Before the end of the call, Dr. Ayoub suggested

that "[Mr. Baaklini] can ask [Mr. Chagoury] to give us some money to donate to you." 9-ER2064. The Congressman said that he could discuss "an event for[] the community" with Mr. Baaklini, and "in the meanwhile" it "would be great" if "people want to contribute individually." 9-ER-2064.

Approximately nine months after Congressman Fortenberry received the call from Dr. Ayoub, the same FBI agent who oversaw the call from Dr. Ayoub arrived unannounced at the Congressman's home in Nebraska, together with an IRS agent from Los Angeles; they falsely stated they were from the FBI's Omaha office. 6-ER-1286–87, 6-ER-1292–93. The Congressman had just returned to Nebraska the night before, after a week of official duties in Kenya, and he was not home when the agents first arrived because of an emergency trip inspecting flood damage in his district caused by an unprecedented "bomb cyclone" storm. 6-ER-1287–89; 8-ER-1851–52. When the agents first arrived, they told the Congressman's wife that they were conducting a "background investigation that had a national security interest or component." 6-ER-1234. The same information was provided to the Congressman in a voicemail message. 6-ER-1236–37. The agents admitted at trial that this was a "ruse" used to trick the Congressman into speaking with them. *See* 6-ER-1293.

9

According to an internal memorandum used to obtain approval for the interview, the purpose of the interview was to develop evidence to charge Congressman Fortenberry with a crime, including specifically the crime of making false statements. *See* 9-ER-2097. In the memorandum, the lead FBI agent stated: "Case agents will also seek to indict Fortenberry with Misprision of Felony and Conduit Contributions. In addition[,] if case agents determine from the interview that Fortenberry is making false statements[,] he will be charged with False Statement." 9-ER-2097. During the nighttime interview in Congressman Fortenberry's living room, the agents eventually asked him a series of vague questions as to whether he was aware of any foreign or conduit contributions to his campaign. *See* 9-ER-2067–72. He denied being aware of any such contributions. *See* 9-ER-2070, 9-ER-2072. He also noted in passing that all contributors to his campaigns had been "publicly disclosed" in his reports to the Federal Election Commission. 9-ER-2074. The Congressman did mention a "comment" that he believed was made by Dr. Ayoub, but the conversation turned to other topics. *See* 9-ER-2076–78.

After receiving the call from Dr. Ayoub, Congressman Fortenberry contacted his election lawyer, who called the Congressman's chief of staff a few days later. *See* 4-ER-773–75, 4-ER-779–82; 9-ER-2089–91. The Congressman later waived privilege so that the agents could speak with his lawyer about the

10

call. 4-ER-773. The lawyer could not recall the particulars of those conversations. 4-ER-793–94.

Following the informal interview at his home, Congressman Fortenberry offered to provide any additional assistance needed for the investigation. 6-ER-1392. In July 2019, several agents, including the assistant United States attorney who would later act as the government's lead trial counsel, met with the Congressman in Washington, D.C., for approximately two hours. 6-ER-1392–93. During the course of that interview, the Congressman openly discussed his connections to Mr. Chagoury, Mr. Baaklini, and Dr. Ayoub. 6-ER-1397. In response to questions from agents, the Congressman once again maintained that he was not aware of any illicit contributions to his campaign. 9-ER-2087. He also told the agents about the phone call he had with Dr. Ayoub; while he could not recall the precise words, he remembered Dr. Ayoub saying something to the effect that "the amounts wouldn't be as large because Gilbert won't be involved." 9-ER-2081. The Congressman told the agents that the comment had "caused [him] concern" but that he "didn't know what it meant." 9-ER-2083.

During the interview, the assistant United States attorney followed up by asking Congressman Fortenberry a precise question about the call from Dr. Ayoub: "During that conversation, did Dr. Ayoub tell you that Toufic Baaklini had given Dr. Ayoub thirty-thousand dollars cash to help fund your

11

fundraiser?" 9-ER-2087. The Congressman denied hearing that, elaborating that such information would have been "horrifying." 9-ER-2088.

Based on his learning of the source of the funds after the meeting, Congressman Fortenberry "wanted to return the money immediately," but was told by the agents that doing so "would hurt the investigation." 7-ER-1647. After further consultation with government agents, the Congressman donated the money to charity. 7-ER-1648.

### B. Proceedings Below

1. On October 19, 2021, a grand jury in the Central District of California indicted Congressman Fortenberry on two counts of making false statements to the government and one count of concealing material facts, in violation of 18 U.S.C. § 1001(a)(1) and (a)(2). 2-ER-192–203. The charges were based on the Congressman's statements during the interviews in Nebraska and Washington, D.C., that he was not aware of illegal contributions to his campaign at the 2016 fundraiser, and that his campaign contributions were all disclosed in his reports to the Federal Election Commission, as well as his denial in the Washington interview of learning specifically that Mr. Baaklini had provided Dr. Ayoub with $30,000 cash to make conduit contributions. *See* 2-ER-192–203.

Before trial, Congressman Fortenberry moved to dismiss the indictment for lack of venue and for failure to allege facts demonstrating that the

alleged false statements were material for purposes of Section 1001. *See* 9-ER-2109 (D. Ct. Dkt. 14, 17). The district court denied both motions. *See* 1-ER-109–125. Citing Supreme Court precedent, the court noted that venue depends on where the "essential conduct elements of the offense" took place. 1-ER-113. But the court rejected the Congressman's argument that the essential conduct was the making of the statements at issue. 1-ER-114. Instead, the court reasoned that, because a false statement is unlawful only when it is material, materiality is also an essential conduct element. 1-ER-114. The court concluded that "the statute requires consideration of both the statement and its potential effect," and that "the act of making a materially false statement occurs not only where the statement is made, but also where it is directed." 1-ER-116–17.

The district court proceeded to determine that Congressman Fortenberry's false statements had a "potential effect" on an investigation occurring in the Central District of California, making venue proper. 1-ER-116. At the same time, however, the district court recognized that this Court "has not addressed the issue of venue in the context of Section 1001(a)," and that other courts of appeals have reached conflicting results. 1-ER-117. The district court further determined that the indictment had sufficiently alleged materiality because it contained facts that "raise an inference that the allegedly false

13

statements either influenced or were capable of influencing the federal investigation." 1-ER-119.

The case proceeded to trial, where the government played recordings of the 2016 call with Dr. Ayoub, as well as the two interviews with Congressman Fortenberry. *See* 5-ER-1098; 6-ER-1239, 6-ER-1394. The Congressman presented evidence calling into question whether he accurately heard and recalled every word of the call from Dr. Ayoub. *See* 8-ER-1819–63. The defense also argued that the Congressman accurately reported the gist of the call to the federal agents and that he would not have understood the specific comment he denied during the Washington interview if he had missed even a word or two of the call. *See* 8-ER-1993–96. The government also called Dr. Ayoub and Mr. Baaklini as witnesses. *See* 4-ER-799–803; 5-ER-933, 5-ER-1024–1103; 6-ER-1105–62. Both testified that they did not tell the Congressman the contributions were unlawful at the time they were made. 5-ER-921; 6-ER-1121. To the contrary, both testified that they concealed the illicit nature of the contributions from the Congressman. 5-ER-924; 6-ER-1121.

The government also called as witnesses the federal agents who conducted the investigation. *See* 6-ER-1162–1342, 6-ER-1372–1403; 7-ER-1405–1543. The agents testified about how they viewed Congressman Fortenberry's statements during the two interviews. IRS agent James O'Leary testified that

the Congressman's statements that he was not aware of any illegal contributions during the Nebraska interview were "significant to the [f]ederal investigation." 6-ER-1279. When asked why, Agent O'Leary explained that the "basis of asking and listening to the answers to those questions w[as] to understand that they're false" based on the call with Dr. Ayoub. 6-ER-1279. Agent Edward Choe similarly testified that the Nebraska interview "heightened [the government's] concerns about the defendant . . . [b]ecause the statements that the defendant made during the interview were inconsistent with . . . the information that had been told to him by [Dr.] Ayoub during the phone call." 6-ER-1391. As for the interview in Washington, Agent Choe testified that the government was already "considering whether it would be appropriate to bring a false statements charge against" the Congressman. 6-ER-1392. Agent Choe added that, as a result of the interviews, the government "reviewed the defendant's [Federal Election Commission] filings," "set up additional interviews," and "obtained text messages from Toufic Baaklini" to determine if the Congressman was telling the truth. 7-ER-1430, 7-ER-1450.

Before the charge conference, the parties submitted competing jury instructions concerning the element of materiality. *See* 9-ER-2126 (D. Ct. Dkt. 162, 163). As relevant here, Congressman Fortenberry requested that the court instruct the jury that "[a] false statement is not material merely because it causes the government to investigate the veracity (truth or falsehood) of the

15

statement itself." 1-ER-106. The court rejected that instruction because it did "not believe that the law supports that definition of materiality." 8-ER-1763. The court instead instructed the jury simply that materiality requires that a fact "had a natural tendency to influence, or was capable of influencing, the decisions or activities of a government agency," and that "[t]he false statement need not have actually influenced the agency, and the agency need not rely on the information in fact[,] for it to be material." 1-ER-14.

The jury convicted Congressman Fortenberry of all three counts. 2-ER-186–191. The district court sentenced him to two years of probation and 320 hours of community service and fined him $25,000. 2-ER-164. In explaining its decision not to impose a custodial sentence, the court noted that, "[b]y all accounts, the defendant is a man of exceptional character" and that "every witness who testified about Mr. Fortenberry's character agreed . . . that he is a person of good, moral, honest character." 2-ER-152.

## SUMMARY OF ARGUMENT

The prosecution in this case was misguided from the moment it began. The government directed an informant to make certain statements on a recorded phone call that Congressman Fortenberry took in Nebraska. Nine months later, agents showed up unannounced at the Congressman's home in Nebraska to ask him about those same statements, with express hopes of catching him in a lie. Agents later interviewed him in Washington, D.C. Yet

the government indicted him in the Central District of California—more than a thousand miles from any of the events giving rise to the charges. There is no precedent for such a prosecution. The decision to charge the Congressman in Los Angeles rather than Lincoln violated the constitutional limits on venue in criminal prosecutions. And by refusing to administer a legally correct jury instruction, the district court allowed the jury to convict him based on an impermissible theory of materiality. Congressman Fortenberry's convictions should be vacated.

I.    Venue was improper in the Central District of California.

A.    Both Article III and the Sixth Amendment of the Constitution protect the right of criminal defendants to be tried in the State and district in which the crime was allegedly committed—that is, the *locus delicti*. To determine the *locus delicti*, courts look to the essential conduct elements of a crime and then determine where the conduct took place. Other elements of the crime that do not focus on the defendant's conduct may be essential to proving a statutory violation, but they are of no moment for determining proper venue.

B.    The proper venue for prosecution under 18 U.S.C. § 1001(a)(1) and (a)(2) is the location where the false statement was made. For the crimes proscribed by those provisions, the only conduct element is the making of the false statement (or the concealment of a fact). As the Tenth and Eleventh Circuits have held, the location where that conduct takes place is thus the only relevant

17

location for purposes of the *locus delicti* analysis. The remaining elements of the offense—federal jurisdiction, mens rea, and materiality—describe the circumstances that must surround the defendant's conduct, but they do not define the defendant's conduct itself.

Here, Congressman Fortenberry made the statements in question in Nebraska and Washington, D.C. Venue was improper more than a thousand miles away in the Central District of California.

C. The district court erred by adopting an effects-based test, which shifted the focus of the venue analysis from the defendant's conduct (as the *locus delicti* test demands) to the conduct's potential effects. In so doing, the district court conflated the distinction between a statute's essential conduct elements and its essential elements more generally, incorrectly concluding that materiality is a conduct element simply because it is an essential element of the crime. But the potential effect of a statement on the *government's* decisionmaking—the salient question for assessing materiality—is separate from the defendant's conduct and is not the focus of the *locus delicti* analysis. The effects test is also inappropriate in the context of Section 1001 because the materiality inquiry under that statute requires only a "potential" effect on governmental decisionmaking.

Although some other courts of appeals have adopted the effects test applied by the district court, those decisions are inconsistent with Supreme

18

Court precedent and are based on the same errors of reasoning as the district court's decision. Those decisions similarly conflate essential conduct elements with essential elements more generally, and they miss the point that an actual effect on the government is not required in order to prove materiality.

D.     The district court did not rely on the special venue statute for continuing offenses, and it was correct not to do so. Continuing offenses "span space and time," and venue under that statute is appropriate in any district in which the offense was "begun, continued, or completed." Here, however, Congressman Fortenberry made the relevant statements in person to government agents in a single location at a single time. The alleged crimes were completed the moment the statements were made in Nebraska and Washington, D.C. Venue in California was thus inappropriate, and the Congressman's convictions should be vacated.

II.     The district court separately erred by giving jury instructions that inadequately defined materiality and allowed the jury to convict Congressman Fortenberry on a legally insufficient basis.

A.     A statement is not "material" for purposes of Section 1001 merely because it could cause the agency to investigate the truth of the statement itself. A statement is instead material only if it is capable of influencing a *particular governmental decision*. To determine if a statement is material, a court must identify both the statement and the governmental decision at issue.

In considering the appropriate governmental decision, courts of appeals have made clear that a decision involving an investigation into the truth of a false statement itself—as opposed to the subject matter of the underlying investigation—is not the type of decision that can support materiality. As those courts have explained, holding otherwise would render the materiality element meaningless, because every false statement would necessarily be capable of influencing such an investigation.

B.    A contrary result would raise serious constitutional concerns. Such a reading would allow for arbitrary and discriminatory law enforcement by permitting the government to prosecute any false statement made to any government official. The Supreme Court has repeatedly refused to embrace such overly broad interpretations of criminal statutes. This Court should do the same.

C.    The district court erred by declining to adopt Congressman Fortenberry's proposed jury instruction on materiality. The court rejected that instruction on the ground that it constituted a misstatement of law under *Brogan* v. *United States*, 522 U.S. 398 (1998). But *Brogan* did not involve materiality at all. Rather, it presented the question whether there is an atextual exception to Section 1001 under which a denial of wrongdoing does not constitute a "statement." *Brogan* thus has no bearing on the distinct question of the relevant governmental decision for purposes of materiality.

D.    The insufficient jury instruction requires vacatur of Congressman Fortenberry's conviction. Without an appropriate instruction, the jury was permitted to convict the Congressman based upon a legally inadequate theory. And where the jury is permitted to consider a legally inadequate theory of the crime along with other, legally valid ones, vacatur is required.  Here, the jury heard evidence that the Congressman's statements were important because they caused the government to investigate whether those same statements were true.  Government agents testified that they conducted the interviews to test the Congressman's credibility, determine whether he would misrepresent the phone call from Dr. Ayoub, and, if so, consider bringing a false-statements charge.  The agents then testified that they took several further investigative steps (such as reviewing the Congressman's federal-election reports) to determine whether he was lying during those interviews.  In light of that testimony, the improperly instructed jury could have found materiality based merely on the government's decision to further investigate the truth of the Congressman's statements.  Because the resulting convictions were legally insufficient, they should be vacated.

## STANDARD OF REVIEW

This Court reviews a district court's denial of a motion to dismiss for improper venue de novo.  *See*, *e.g.*, *United States* v. *Hsiung*, 778 F.3d 738, 745 (9th Cir. 2015).  This Court also reviews de novo whether a jury instruction

correctly states the law. *United States* v. *Renzi*, 769 F.3d 731, 755 (9th Cir. 2014). A new trial is warranted "if the instruction actually given was misleading or inadequate to guide the jury's deliberation." *Id.*

## ARGUMENT

## I. VENUE WAS IMPROPER IN THE CENTRAL DISTRICT OF CALIFORNIA

The government tried Congressman Fortenberry in the Central District of California on charges of making false statements in interviews conducted in Nebraska and Washington, D.C. But multiple provisions of the Constitution protect the right of criminal defendants to be tried in the place where the crime was committed. The Supreme Court has interpreted those provisions to require a prosecution to occur in the location in which the accused committed the conduct giving rise to criminal liability. Here, those acts were the communication of the false statements, which did not occur anywhere near the Central District of California. In holding otherwise, the district court adopted an effects-based test for determining venue in a criminal case. That was erroneous. Venue was improper, and the Congressman's convictions should therefore be vacated.

### A. The Constitution Requires A Prosecution To Proceed In The Venue Where The Crime Was Committed

As the Supreme Court has explained, "[p]roper venue in criminal proceedings was a matter of concern to the Nation's founders." *United States* v.

*Cabrales*, 524 U.S. 1, 6 (1998). To protect against the injustice of subjecting a defendant to a trial "in some distant state, away from his friends, witnesses, and neighborhood," the Framers "designed a system that requires trial in the vicinity of the crime." *United States* v. *Lozoya*, 982 F.3d 648, 651 (9th Cir. 2020) (citation omitted).

Two separate provisions of the Constitution protect the right of a criminal defendant to be tried by a jury of his peers in the place in which the crime was committed—the *locus delicti*. Article III, Section 2, provides that "[t]he trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the State where the said crimes shall have been committed." The Sixth Amendment, too, requires trial "by an impartial jury of the State and district wherein the crime shall have been committed." Underscoring the right, Federal Rule of Criminal Procedure 18 provides that "prosecution shall be had in the district in which the offense was committed."

While Congress has some authority to specify where a crime is committed for venue purposes, *see*, *e.g.*, *United States* v. *Anderson*, 328 U.S. 699, 703 (1946), it is often silent on the issue. Where that is so, a court determines the *locus delicti* by looking to the "nature of the crime alleged and the location of the act or acts constituting it." *Id*. A court identifies the nature of the crime by assessing "the acts of the accused that violate a statute." *Johnston* v. *United States*, 351 U.S. 215, 220 (1956); *see also Anderson*, 328 U.S. at 705. A

court identifies those acts—that is, the "conduct that constitutes an offense"—
by looking to the "essential conduct elements" of the crime and then determin-
ing where the conduct took place. *United States* v. *Rodriguez-Moreno*, 526
U.S. 275, 280 (1999). Other elements of the crime that do not constitute a part
of the defendant's conduct, including "circumstance element[s]," are not taken
into account in determining the place of the crime. *Id.* at 280 n.4.

The Supreme Court's decision in *Cabrales*, *supra*, illustrates the distinc-
tion between conduct and non-conduct elements. In *Cabrales*, the Court con-
sidered the appropriate venue for prosecuting the violation of money-launder-
ing statutes that prohibit financial transactions where the funds were the pro-
ceeds of "specified unlawful activity" and the defendant knew that the funds
came from an illicit source. 524 U.S. at 8. The Court held that venue was
proper only in Florida, the State in which the financial transactions took place.
*See id.* at 7-8. The location of the specified unlawful activity—drug trafficking
in Missouri—was "of no moment" for venue purposes, *id.* (citation omitted),
because the money-laundering statutes at issue "interdict[ed] only the finan-
cial transactions" themselves, *id.* at 7. The Court noted that the defendant
was not charged with involvement in the Missouri drug trafficking and that
the government need only prove that the defendant knew she was dealing with
funds derived from that unlawful activity. *Id.* at 8. Because involvement with

the drug trafficking was not a conduct element of money laundering, the Court concluded that venue was improper in Missouri. *See id.* at 7-8.

The Supreme Court's decision in *Rodriguez-Moreno*, *supra*, is also illustrative. At issue there was the appropriate venue for a charge of using or carrying a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(c)(1). *See* 526 U.S. at 276. The defendant had possessed a firearm only in Maryland, but the underlying crime of violence—a kidnapping—had continued across several states, including New Jersey. *See id.* at 277. The Court held that venue was proper in New Jersey. *See id.* at 280-281. As the Court explained, an "essential conduct element" of the crime was that the defendant "committed all the acts necessary to be subject to punishment for kidnaping," as well as that he "used a firearm." *Id.* at 280. The Court contrasted the situation before it with *Cabrales*, explaining that the requirement to show underlying unlawful activity in *Cabrales* was merely a "circumstance element" that need not involve the defendant at all. *Id.* at 280 n.4.

The Supreme Court has also taught that, where a criminal statute is ambiguous as to which elements constitute conduct elements, a court should take a restrictive approach to the statute for venue purposes. If Congress chose not to provide for "a choice of trial" by specifying venue, a court should not interpret a criminal statute broadly to allow for venue in multiple places. *United States* v. *Johnson*, 323 U.S. 273, 276 (1944). That is so even if the

25

broader interpretation is reasonable: "If an enactment of Congress equally permits the underlying spirit of the constitutional concern for trial in the vicinage to be respected rather than to be disrespected, construction should go in the direction of constitutional policy even though not commanded by it." *Id.*

### B. The Proper Venue For A Section 1001 Prosecution Is The Location Where The False Statement Was Made

Because Congress did not specify a venue for the prosecution of offenses under Section 1001, this Court must determine where "the conduct that constitutes [the] offense" occurred. *Rodriguez-Moreno*, 526 U.S. at 280. As is relevant here, Section 1001 imposes criminal penalties on anyone who, with respect to a matter within the federal government's jurisdiction, knowingly and willfully (1) "falsifies, conceals, or covers up by any trick, scheme, or device a material fact" or (2) "makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(1) & (2). Section 1001 thus includes four applicable elements:

(1)  the defendant made a false statement (Section 1001(a)(2)) or falsified, concealed, or covered up a fact (Section 1001(a)(1));

(2)  the statement was made in any matter within the federal government's jurisdiction;

(3)  the defendant acted knowingly and willfully;

(4)  the false statement was material to the federal government's activities or decisions.

*See United States* v. *Atalig*, 502 F.3d 1063, 1067 (9th Cir. 2007); Ninth Circuit Model Criminal Jury Instruction 24.10.

Of those four elements, only the making of a false statement or the concealment of a fact is a conduct element. The remaining elements describe additional circumstances that must be present for the defendant's conduct to become criminal. For example, the second element requires the statement to concern matters within the federal government's jurisdiction. The third requires the speaker to act with criminal intent. And the fourth requires the statement objectively to be capable of affecting the government's activities. Those elements do not define the defendant's acts, though they remain essential elements of the offense that the government must prove beyond a reasonable doubt. Accordingly, the "act[] of the accused that violate[s] [the] statute" under the *locus delicti* test, *Johnston*, 351 U.S. at 220, is the making of the false statement (or the concealment of a fact).

*Cabrales* is directly on point here. There, an essential element of the money-laundering offenses was the unlawful source of the laundered funds. But that element merely described a necessary characteristic of the funds for the financial transaction—the conduct element—to constitute a crime. *See* 524 U.S. at 7-8. So too here: the element of materiality merely describes a characteristic of the false statement that is necessary for criminal consequences to

arise. But that does not make it a conduct element relevant to determining proper venue for a Section 1001 charge.

The Tenth Circuit reached that very conclusion in *United States* v. *Smith*, 641 F.3d 1200 (2001). There, the government was investigating the defendant for embezzling money from a nonprofit organization in Oklahoma. *See id.* at 1203. During the investigation, however, the defendant resigned and moved to Minnesota. *See id.* A federal agent traveled from Oklahoma to Minnesota to interview the defendant, and the defendant made false statements about his activities in Oklahoma during the course of that interview. *See id.* at 1204. The government tried the defendant in the Western District of Oklahoma, where the investigation originated, for violating Section 1001. The defendant was convicted.

The Tenth Circuit vacated the defendant's Section 1001 conviction on the ground that venue was improper. *See* 641 F.3d at 1207, 1209. The court explained that Section 1001 does not include "any language suggesting any 'essential conduct element' other than making a false statement." *Id.* at 1207 (citation omitted). The *locus delicti*, the court thus concluded, "is where the defendant makes the false statement"—there, in Minnesota. *Id.* The court squarely rejected the government's position that venue is proper in any district with "substantial contacts" with the crime. *Id.* at 1208. In addition, the court concluded that the violation was not a "continuing offense" that occurred

28

in multiple districts, because the statements "began, continued, and ended during the interview" in Minnesota. *Id.* at 1208-1209.[*]

The Eleventh Circuit subsequently relied on the Tenth Circuit's decision in *Smith* to conclude that venue for a Section 1001 charge is "proper only in the district or districts where the defendant made the false statement." *United States* v. *John*, 477 Fed. Appx. 570, 572 (2012). In that case, government agents from the Northern District of Florida interviewed the defendant in the Southern District of Florida in connection with a wire-fraud investigation, seeking "to determine the nature of her involvement in the fraud and to assess her credibility as a potential government witness." *Id.* at 571 (footnote omitted). The defendant made a false statement during the interview and was indicted, tried, and convicted in the Northern District of Florida. *See id.* at 572. The Eleventh Circuit vacated the defendant's conviction on the ground that venue was improper. *See id.* Expressly agreeing with the Tenth Circuit,

---

[*] The Tenth Circuit noted that "[t]he interview [in Minnesota] was not recorded, transcribed, or otherwise preserved for use in Oklahoma." 641 F.3d at 1209. But it is unclear why the existence of a recording or transcription would affect the relevance of the materiality element, which concerns the potential effect of the "fact"—or "information"—being conveyed. *See United States* v. *Johnson*, 19 F.4th 248, 259 (3d Cir. 2021); *United States* v. *Service Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998); *United States* v. *Johnson*, 530 F.2d 52, 55 (5th Cir. 1976). The Tenth Circuit has not treated the lack of a recording or transcription as essential to *Smith*'s holding. *See United States* v. *Acosta-Gallardo*, 656 F.3d 1109, 1121 (10th Cir. 2011) (describing *Smith* as holding that that "venue would have been proper only in Minnesota, where the false statement was made").

the Eleventh Circuit held that the location of the government's investigation had no bearing on where the crime was committed because the government investigation was distinct from the defendant's "own offense conduct," which "began, continued, and was completed in the Southern District of Florida." *Id.*

The Tenth and Eleventh Circuits' treatment of materiality as a circumstance element is consistent with the Supreme Court's treatment of Section 1001's jurisdiction element in *United States* v. *Yermian*, 468 U.S. 63 (1984). There, the Supreme Court explained that Section 1001's jurisdictional element is a "predicate circumstance" that serves to "identify the factor that makes the false statement an appropriate subject for federal concern." *Id.* at 69. The same reasoning applies to the materiality element: it helps to determine whether a false statement is appropriate for "federal concern" by asking whether the statement had a "natural tendency to influence, or was capable of influencing, the decision" of the relevant governmental body. *United States* v. *Gaudin*, 28 F.3d 945, 950 (9th Cir. 1994) (citation omitted), *aff'd*, 515 U.S. 506 (1995). It is thus a "predicate circumstance" of a Section 1001 violation, rather than the actual conduct prohibited by the statute. The location of the government action that the statement could potentially influence is not the location of the offense and thus not an appropriate venue. *See Rodriguez-Moreno*, 526 U.S. at 280.

Properly applied, the *locus delicti* test makes clear that venue is inappropriate in the Central District of California. The charged conduct took place entirely outside that district: the statements at issue were made by Congressman Fortenberry during the course of in-person interviews with government agents in Nebraska and Washington, D.C. *See* 2-ER-197, 2-ER-201–02. The district court's decision to permit venue in the Central District of California was erroneous.

### C. The District Court Erred By Adopting An Effects-Based Test For Determining Venue For Section 1001 Prosecutions

In holding that venue was proper in the Central District of California, the district court reasoned that, because Section 1001 prohibits "materially false statements," the court must consider "both the statement and its potential effect." 1-ER-116. According to the district court, venue was proper in the Central District because the "potential effect" of Congressman Fortenberry's statements was on the government investigation in Los Angeles. That conclusion is deeply flawed.

1. The district court's reasoning improperly shifts the focus of the venue inquiry from the defendant to the government. Under the Constitution, venue lies only where the defendant's "crime[] shall have been committed." Art. III, § 2, cl. 3. The *locus delicti* is the "location of the act" constituting the crime. *Cabrales*, 524 U.S. at 7. But the district court determined the *locus delicti* based on the crime's "potential effects" on the government. In other

31

words, the district court decided that venue was proper not where the defendant committed the relevant act, but rather where the government *investigated* the crime. *See* 1-ER-116.

At the root of the district court's error is its conclusion that materiality is an essential conduct element of a Section 1001 offense. As the district court recognized, the materiality of a statement depends on the "intrinsic capability" of the statement to influence an investigation. 1-ER-116. In other words, materiality is assessed based on the face of the defendant's statement and requires no further conduct by the defendant. Nor does it require any actual effect on the government; a statement may be material "even if [it] miss[es] spectacularly or stand[s] absolutely no chance of succeeding." 1-ER-116. Accordingly, the criminal act is completed as soon as the false statement of material fact is made—regardless of any future effects. The location of the investigation is thus wholly irrelevant to the question of where the criminal conduct occurred.

In reaching the contrary conclusion, the district court conflated an essential element with an essential *conduct* element. According to the district court, materiality is essential because, "[a]bsent materiality, a false statement is not conduct proscribed by law." 1-ER-117. The district court disagreed with the Tenth and Eleventh Circuits because, in its view, those courts did "not explain how the act of making a false statement—without consideration of its

32

materiality—can be considered the prohibited act." 1-ER-117. It is true, of course, that materiality is an essential element of a Section 1001 violation. But the *locus delicti* test requires courts to look to the essential *conduct* elements of the crime—"the acts of the defendant [that] constituted the violation," *Anderson*, 328 U.S. at 705—and not to any element more generally deemed essential.

2. To be sure, three other courts of appeals have adopted an "effects"-based test for determining venue for Section 1001 offenses. Those decisions are incorrect.

Start with the Seventh Circuit's decision in *United States* v. *Ringer*, 300 F.3d 788 (2002). There, federal agents interviewed the defendant in Kentucky, and the defendant made false statements about an acquaintance's drug-trafficking activities in Indiana. *See id.* at 790. As a result of those false statements, the government dropped its drug-trafficking investigation of the acquaintance. The government tried and convicted the defendant in Indiana for violating Section 1001, and the Seventh Circuit held that venue was proper there. The court reasoned that "events took place [in Indiana] which were critical to proving the elements of the false statements case," because "the halting of the investigation against [the acquaintance] in the Southern District of Indiana was evidence of the materiality of Ringer's statements." *Id.* at 791-792.

The Seventh Circuit erred by asking where events "critical to proving the elements" of the offense occurred. *Ringer*, 300 F.3d at 791. Properly understood, the *locus delicti* test asks where the defendant's *conduct* occurred. *See Rodriguez-Moreno*, 526 U.S. at 279. The Seventh Circuit did not focus on the essential conduct elements of the offense: its only discussion of the defendant's conduct was its claim that the Southern District of Indiana's "strong link to [the defendant's] conduct makes it relevant to determining venue, not as an explicit geographic element . . . but as a place where events took place that were necessary to establish materiality." *Id.* at 792. The Supreme Court has required more than a "link" between the defendant's essential conduct and venue: venue lies only in the district where the "conduct constituting the offense" actually occurred. *Rodriguez-Moreno*, 526 U.S. at 279.

What is more, the Seventh Circuit's analysis is flawed on its own terms, because the "events [that] took place" in Indiana were *not* "necessary to establish materiality." *Ringer*, 300 F.3d at 792. As the Seventh Circuit recognized, "the government does not have to prove that a proceeding was affected," *id.*; it needed only to prove that the false statements would naturally affect the investigation. While the Seventh Circuit did assert that the objective nature of the materiality inquiry "does not mean that the Indiana investigation was irrelevant," *id.*, it provided no support for the assertion that the mere "relevance" of a jurisdiction to a case supplies a sufficient basis for venue.

34

The Second Circuit made a similar error in *United States* v. *Coplan*, 703 F.3d 46 (2012). There, the court held that venue was proper in the Southern District of New York for a Section 1001 charge based on the defendant's statement during a deposition conducted in Tennessee. *See id.* at 78. Applying reasoning similar to the Seventh Circuit's, the Second Circuit held that venue was proper in the Southern District of New York because the element of materiality was a conduct element that "require[d] evidence that th[e] statements were conveyed to or had an effect on the IRS investigators working in the Southern District of New York." *Id.* at 79. But the Second Circuit did not explain why it viewed the materiality element as a conduct element. And it erred in reasoning that evidence of the transmission of the false statements by the federal agents who heard the statements to other federal agents was required in order to prove materiality. *See Gaudin*, 28 F.3d at 950.

The Fourth Circuit's reasoning in *United States* v. *Oceanpro Industries, Ltd.*, 674 F.3d 323 (2012), is similarly flawed. There, the court adopted an effects-based test for determining venue on the ground that "Congress ha[s] the power to define the essential conduct elements of a criminal offense in terms of their effects, thus providing venue where those effects are felt." *Id.* at 328 (internal quotation marks, citation, and emphasis omitted). But while Congress can, subject to constitutional limitations, "indicate where [it] considered the place of committing the crime to be," *Anderson*, 328 U.S. at 703, there is

35

no indication it did so with respect to Section 1001. There is no venue provision in Section 1001 itself, and no other statute designates venue for Section 1001 offenses. Nor does Congress's decision to require proof of materiality demonstrate that Congress defined the essential conduct element of Section 1001 "in terms of its effects"—particularly when materiality does not require any actual effect on governmental decisionmaking. *See Gaudin*, 28 F.3d at 943.

Section 1001 stands in stark contrast to statutes that plainly provide for venue based on the effects of the offense. For example, the witness-tampering statute includes a special venue provision stating that a prosecution "may be brought in the district in which the official proceeding . . . was intended to be affected *or* in the district in which the conduct constituting the alleged offense occurred." 18 U.S.C. § 1512(i) (emphasis added). Any constitutional concerns notwithstanding, the statute recognizes that conduct and effect are distinct, and it expressly provides for venue both in the district where the conduct occurred and in the district where the effect was intended. Section 1001, on the other hand, does not include any such special venue provision, so venue is proper only in the district where the essential conduct constituting the offense occurred. *See Rodriguez-Moreno*, 526 U.S. at 279 n.1; *Anderson*, 328 U.S. at 703.

In addition, Congress knows how to "define the essential conduct elements of a criminal offense in terms of their effects," and it has expressly done

so for multiple offenses. *Oceanpro*, 674 F.3d at 328 (citation and emphasis omitted). For example, the Hobbs Act imposes criminal penalties on any person who "obstructs, delays, or *affects* commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a) (emphasis added); *see also United States* v. *Smith*, 198 F.3d 377, 383 (2d Cir. 1999). And the Computer Fraud and Abuse Act imposes criminal penalties on anyone who "intentionally accesses a protected computer without authorization, and as a result of such conduct, *causes damage and loss*." 18 U.S.C. § 1030(a)(5)(C) (emphasis added); *see also United States* v. *Auernheimer*, 748 F.3d 525, 537 (3d Cir. 2014).

Because Section 1001 does not specifically provide for venue based on effects and does not require an actual effect on a governmental decision, the effects-based test is inappropriate. The Court should thus apply the traditional *locus delicti* test and hold that Congressman Fortenberry could not be prosecuted in the Central District of California for statements he made in Nebraska and Washington, D.C.

### D. The Special Venue Statute For Continuing Offenses Does Not Apply

The district court did not rely on the special venue statute for continuing criminal offenses, 18 U.S.C. § 3237(a), *see* 1-ER-112–18, and it was correct not to do so. As this Court has explained, "[c]rimes consisting of a single noncontinuing act are 'committed' in the district where the act is performed." *United*

*States* v. *Corona*, 34 F.3d 876, 879 (9th Cir. 1994). But where an offense is considered to be continuing, a special venue provision applies. Under Section 3237(a), "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Continuing offenses include crimes consisting of "distinct parts which have different localities," such as certain types of conspiracy, *Rodriguez-Moreno*, 526 U.S. at 281 (citation omitted), or crimes "involving a continuously moving act" that is "committed wherever the wrongdoer roamed," such as kidnapping, *Travis* v. *United States*, 364 U.S. 631, 636 (1961) (internal quotation marks and citation omitted).

The charges against Congressman Fortenberry do not involve a continuing offense. The Congressman made the statements in question during discrete interviews in Nebraska and Washington, D.C. Those interviews did not span space or time; each occurred in a single sitting, with federal officers speaking directly with the Congressman in person. His statements are thus distinct from a false-statements charge involving mail or telephone conversations, in which the speaker directed his statements to a person located in a different jurisdiction. *Cf.*, *e.g.*, *United States* v. *Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990); *De Rosier* v. *United States*, 218 F.2d 420, 422-423 (5th Cir. 1955).

Although the district court suggested that Congressman Fortenberry's statements "were directed at" the Central District of California, 1-ER-116, the indictment did not make that allegation, and the evidence at trial shows that the statements were directed at federal agents in Nebraska and Washington, D.C. *Cf.* D. Ct. Dkt. 18, at 21; 9-ER-2109. The fact that the statements could have a "potential effect" on the Central District does not mean the defendant "directed" the statements at that district. Nor does the fact that the government investigation continued in the Central District transform the false-statements charge into a continuing offense. It is the *defendant*'s continuing conduct—not that of the government—that matters for purposes of venue.

This Court's decision in *United States* v. *Angotti*, 105 F.3d 539 (1997), is not to the contrary. In that case, the Court held that the crime of making false statements on a loan application under 18 U.S.C. § 1014 "continues until the communication is received by the person or persons whom it is intended to affect or influence." *Angotti*, 105 F.3d at 543. Even assuming *Angotti* remains good law after *Cabrales* and *Rodriguez-Moreno* clarified the *locus delicti* test, it is readily distinguishable. Section 1014 punishes anyone who "knowingly makes any false statement or report" in a loan or credit application "for the purpose of influencing in any way the action" of a federally insured institution. The false statement thus had to be communicated to the relevant institution in

order to show the necessary purpose, and that occurred when the communication was received in the relevant district. Section 1001 requires no corresponding purpose.

Indeed, this Court has effectively limited *Angotti* on that basis. In *United States* v. *Marsh*, 144 F.3d 1229 (1998), the Court considered the proper venue for the crime of endeavoring to impede the administration of the tax laws by filing commercial liens in Nevada and Washington against government agents from the Northern and Eastern Districts of California. *Id.* at 1233. The government invoked *Angotti* and argued that venue in the Northern District of California was appropriate because "an effect of the filing of the liens was an impact on the IRS officers in San Jose, California, who were conducting a criminal investigation of the defendants." *Id.* at 1242. This Court rejected that argument, explaining that "the crime of endeavoring to impede the IRS is complete when the endeavor is made"; "[t]he government did not have to show that its agents abandoned their investigation or even that the agents were anxious about the effect of the liens on their credit." *Id.* In other words, "[n]o effect need be proved" because "[t]he filing of the lien is the crime." *Id.* The court therefore held that venue was improper and set aside the convictions. *See id.*

The reasoning of *Marsh* applies with equal force here. The criminal act of making a false statement "is complete when the [statement] is made." 144

40

F.3d at 1242. "The government did not have to show that" the statement actually affected the investigation in the Central District of California, because "[n]o effect need be proved." *Id.* The Court should follow that reasoning here and vacate Congressman Fortenberry's convictions because the venue was improper.

## II.   THE JURY INSTRUCTION ON MATERIALITY CONSTITUTED AN INCOMPLETE STATEMENT OF THE LAW

On the merits, the district court's jury instructions diluted the element of materiality to the point of rendering it meaningless. The materiality of a false statement is measured in light of the relevant decision before the applicable government agency at the time the statement was made. As a matter of law, however, a false statement is not material merely because it could cause the agency to investigate the truth of the statement itself. Because the district court declined to instruct the jury on that point of law, there is no way of knowing whether the jury convicted Congressman Fortenberry merely because his statements could have caused the government to investigate the truth or falsity of those statements. If the Court does not vacate his convictions because of improper venue, it should do so because of instructional error and remand for a new trial.

### A. A Statement Is Not 'Material' Merely Because It Could Cause The Government To Investigate The Truth Of The Statement Itself

Federal law does not criminalize every false statement made to the government. Materiality is the legal standard that separates false statements of consequence from false statements of little or no significance. Under the common law, a false statement was not criminal unless it was "in some point material to the question in dispute" and did not concern only "some trifling collateral circumstance, to which no regard is paid." 4 William Blackstone, Commentaries *137. In light of the common law, "it is unsurprising that a number of federal statutes criminalizing false statements to public officials" incorporate a "materiality" requirement. *Kungys* v. *United States*, 485 U.S. 759, 769 (1988).

Section 1001 is one of those statutes. As relevant here, Section 1001(a)(2) criminalizes only a "materially false, fictitious, or fraudulent statement or representation," and Section 1001(a)(1) criminalizes only the falsification or concealment by "trick, scheme or device" of a "material fact" (assuming the jurisdictional and intent elements are satisfied).

By inserting a materiality requirement into Section 1001, Congress limited the types of false statements that could give rise to criminal consequences based on the potential effects of the statement on the listener. As already ex-

plained, a false statement is material only if it has "a natural tendency to influence, or was capable of influencing," a specific decision of a governmental agency. *Gaudin*, 28 F.3d at 950 (citation omitted). And as the Supreme Court made clear in affirming this Court's decision in *Gaudin*, materiality is a "mixed question of law and fact" that "requires the determination of at least two subsidiary questions" of historical fact: "what statement was made?" and "what decision was the agency trying to make?" *United States* v. *Gaudin*, 515 U.S. 506, 512 (1995) (citation omitted). Accordingly, only after identifying the "statement" and the relevant "decision" can a jury answer the "ultimate question" of "whether the statement was material to the decision." *Id.*

Following the Supreme Court's decision in *Gaudin*, courts of appeals have consistently evaluated the materiality of false statements by looking at the relevant decision that the government agency was trying to make. Although materiality is ultimately a jury question, not every governmental decision is legally sufficient to establish materiality in a Section 1001 prosecution. It is thus the court's job to ask whether the particular government action at issue is "the type of decision that, without more, itself gives rise to materiality," thereby "supporting a conviction under [Section] 1001." *United States* v. *Johnson*, 19 F.4th 248, 260-261 (3d Cir. 2021); *see also United States* v. *Camick*, 796 F.3d 1206, 1218-1219 (10th Cir. 2015).

In particular, courts have routinely made clear that, as a matter of law, an investigation into the truth of the statement alleged to be false is not the kind of governmental decision that can support a finding of materiality under Section 1001. The Second Circuit expressly reached that conclusion in *United States* v. *Litvak*, 808 F.3d 160 (2015). There, the defendant had been charged and convicted of making false statements to the Department of the Treasury. The government argued that the statements were material because they were capable of causing Treasury to "refer[] the matter . . . for investigation." *Id.* at 173 (citation omitted).

The Second Circuit disagreed. *See* 808 F.3d at 173-174. The court explained that "every prosecution for making a false statement undoubtedly involves decisions by the government to refer for investigation, investigate, and prosecute the defendant for making the false statement at issue." *Id.* at 173 (internal quotation marks omitted). But, the court reasoned, "neither the fact that the [government] decided to refer Litvak's statements for investigation, nor that the government subsequently decided to conduct an investigation and prosecute Litvak for those statements, has any bearing on the materiality of those statements as required by the statute." *Id.* at 174. "[T]he materiality element would be rendered meaningless," the court explained, "if it were sufficient for the government merely to establish the capability of the false statement to influence an agency staffer's, investigator's, or prosecutor's decision

44

to refer for investigation, investigate, or prosecute the defendant for the very statement at issue." *Id.* at 173 (internal quotation marks omitted).

In *Johnson*, *supra*, the Third Circuit agreed with the Second Circuit's approach in *Litvak*. The defendant there was convicted of making a false statement under Section 1001 because he "posed as an attorney and filed a fabricated document on the civil docket of one of the lawsuits against [Bill] Cosby." 19 F.4th at 252. Concluding that the case before it was "even further afield" than *Litvak*, the Third Circuit reversed the conviction. *Id.* at 260 The court focused on the question of "what decision was the agency trying to make," concluding that it was "fatal to the Government's case" that there was simply "no decision entrusted to the Judge [that] could have possibly been in-fluenced by the [document]." *Id.* at 257 (quoting *Gaudin*, 515 U.S. at 512). The Third Circuit explained that, if "the mere fact that the governmental deci-sionmaker ha[s] received the misstatements and that its staff had reviewed [them]" could be sufficient, it would "render the materiality element meaning-less, and the scope of [Section] 1001 absurd." *Id.* at 260 (internal quotation marks, citation, and alteration omitted).

In sum, the scope of Section 1001 is limited by its materiality require-ment. And the relevant decision against which materiality is measured cannot be the (theoretical or actual) decision to investigate the truth of the very state-ment at issue. Otherwise, *every* false statement to a government official would

be necessarily material—and the element of materiality would serve no function at all.

### B. Adopting A Broad Reading of Materiality Would Raise Serious Constitutional Concerns

The district court's conclusion that a statement is material whenever it might cause the government to investigate the truth of that very statement raises serious constitutional concerns. Due process not only "guarantees that people have 'fair notice' of the conduct a statute proscribes," but also "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions* v. *Dimaya*, 138 S. Ct. 1204, 1212 (2018). Yet under the district court's broad reading of Section 1001's materiality requirement, the doors of federal court would be open to the prosecution of *any* false statement to *any* government official. Such a sweeping reading of Section 1001 would "encourage arbitrary and discriminatory enforcement," *Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983), and "hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges," *United States* v. *Davis*, 139 S. Ct. 2319, 2323 (2019). Under the district court's view, false statements to government officials would be material by definition, and the government could always secure a conviction under Section 1001 simply by showing that it took steps to prove the statement was in fact false.

Consistent with the Supreme Court's repeated refusals to embrace overly broad interpretations of criminal statutes, *see*, *e.g.*, *Yates* v. *United States*, 574 U.S. 528, 536, 543 (2015); *Skilling* v. *United States*, 561 U.S. 358, 410-12 (2010), this Court should refrain from blessing such a limitless interpretation of Section 1001. Indeed, in recent years, the Supreme Court has narrowly construed even public-corruption statutes, so as to "prevent [those] statutes from criminalizing all acts of dishonesty by state and local officials." *Kelly* v. *United States*, 140 S. Ct. 1565, 1571 (2020); *see McDonnell* v. *United States*, 136 S. Ct. 2355, 2357 (2016). Here, the district court's reading of Section 1001 would create an even bigger problem: it would criminalize *every* dishonest statement to government officials about any matter within the jurisdiction of the United States. That result cannot be squared with the Supreme Court's refusal to interpret statutes as criminalizing all dishonest acts by government officials.

If read so sweepingly, Section 1001 would "arm[] Government agents with authority not simply to apprehend lawbreakers, but to generate felonies" and "create a crime" out of induced statements that "misled no one." *Brogan*, 522 U.S. at 409-410, 416 (Ginsburg, J., concurring). It would confirm that Section 1001 is an "ever-metastasizing" provision, *United States* v. *Moore*, 612 F.3d 698, 702 (D.C. Cir. 2010) (Kavanaugh, J., concurring), which punishes "the most casual false statements so long as they turned out, unbeknownst to

47

their maker, to be material to some federal agency function," *Yermian*, 468
U.S. at 82 (Rehnquist, J., dissenting). This Court should refuse to adopt such
a boundless interpretation.

### C. The District Court Erred By Declining To Give Congressman Fortenberry's Jury Instruction On Materiality

The jury was not correctly instructed on the materiality element. The
district court told the jury that a fact or statement is material if "it had a nat-
ural tendency to influence, or was capable of influencing, the decisions or ac-
tivities of a [g]overnment agency." 8-ER-1928. It also explained that "[m]ate-
riality must be judged by the facts and circumstances of the investigation at
issue in this case." 8-ER-1928. But the court declined to instruct the jury that
"[a] false statement is not material merely because it causes the government
to investigate the veracity, truth, or falsehood of the statement itself." 8-ER-
1762. The defense proposed that instruction out of a "concern in this case"
that "the government's investigation appears to be mostly into whether the
[C]ongressman's statements were in fact true or false." 1-ER-66. "If that
were the basis for materiality," the defense continued, the materiality element
would be "subsumed in . . . the false statement element." 1-ER-66.

In rejecting Congressman Fortenberry's request that the jury must be
instructed that materiality cannot be premised merely on a statement's ability
to influence an investigation "to determine whether his statements were true
or false," 8-ER-1766, the district court took the view that such an instruction

would "misstate[] the law," 1-ER-68. The district court quoted a passage from *Brogan* v. *United States*, 522 U.S. 398 (1998), in which the Supreme Court explained that "[c]ertainly the investigation of wrongdoing is a proper governmental function, and since it is the very purpose of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function." 8-ER-1767. In the district court's view, that passage "preclude[d]" the requested instruction. 8-ER-1767.

That conclusion was erroneous. In *Brogan*, the Supreme Court addressed only the question whether a "false statement that consists of the mere denial of wrongdoing"—an "exculpatory no"—could constitute a "false statement" within the meaning of Section 1001. *See* 522 U.S. at 399. Even the government had recognized that "the materiality of the false statement" was not before the Court. *See* U.S. Br. at 21, 1997 WL 597302 (No. 96-1579). Put another way, the Court focused in *Brogan* on the first question it had discussed in *Gaudin*: "what statement was made?" *Gaudin*, 515 U.S. at 512. And because Section 1001 "covers 'any' false statement," the Court held that a Section 1001 prosecution can validly rest on a defendant's "exculpatory no" statement. *Brogan*, 522 U.S. at 400. The second question raised in *Gaudin*—"what decision was the agency trying to make?"—was not at issue before the Court in *Brogan*. 515 U.S. at 512. And the Court in no way disturbed the two-question

approach it had set out in *Gaudin*. *See Johnson*, 19 F.4th at 257; *Litvak*, 808 F.3d at 172-173.

In Section 1001 cases, the relevant governmental decision is the fact that can transform any garden-variety false statement into one that is *material*; it is what distinguishes lies from crimes. Because the materiality standard is an objective one, *see United States* v. *Service Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998), a focus on the decision the agency is trying to make is critical. If Section 1001 covers any false statement that could influence an investigation into the statement's truth, every statement to a government official would be material—because the government could always choose to investigate the truth of any statement made to it. The distinction between criminal statements and lawful ones would thus entirely turn on proof of falsity, and the materiality element would become "meaningless." *See Litvak*, 808 F.3d at 173; *Johnson*, 19 F.4th at 260. But as this Court confirmed in the analogous context of a perjury prosecution, *see United States* v. *Culliton*, 328 F.3d 1074, 1078 (9th Cir. 2003), "simply offering the allegedly false statement itself is not enough" to prove that the statement "alleged to be false was material," *United States* v. *Leon-Reyes*, 177 F.3d 816, 819-820 (9th Cir. 1999). The district court's conclusion—that every government investigation seeks the truth, and that therefore any false statement to investigators is always material—is unsupported and erroneous.

Contrary to the government's contention below, *see* D. Ct. Dkt. 208, at 12; 9-ER-2131, this Court's decision in *United States* v. *Matanky*, 482 F.2d 1319 (1973), did not bless such an expansive reading of Section 1001. The scope of the materiality requirement under Section 1001 was not at issue in *Matanky*. There, the question was whether the submission of false Medicare reimbursement forms to "private insurance carriers rather than directly to the government" could "be deemed to contain statements 'in a matter within the jurisdiction of any department or agency of the United States,' within the meaning of [S]ection 1001." *Id.* at 1322. The defendant argued that, if those forms were considered "statements" within the government's jurisdiction, Section 1001 would be unconstitutionally vague. *Id.* This Court disagreed, concluding that there were "no vagueness problems with [S]ection 1001, either as construed or as applied to th[at] case." *Id.* But that holding was plainly limited to the question of what qualifies as a "statement" within federal jurisdiction for purposes of Section 1001. The Court did not reach the issue of what government "decision" is legally capable of turning a false statement into a *material* false statement.

### D.    Vacatur Is Required To Remedy The Instructional Error

The district court's error requires vacatur and a new trial. As a general matter, "[a]n erroneous jury instruction that describes an element of the offense is harmless only if it is clear beyond a reasonable doubt that a rational

51

jury would have found the defendant guilty absent the error." *United States* v. *Castillo-Mendez*, 868 F.3d 830, 839 (9th Cir. 2017) (internal quotation marks and citation omitted). But where "jurors have been left the option of relying upon a legally inadequate theory" of the crime, "there is no reason to think that [the jurors'] own intelligence and expertise will save them from that error." *Griffin* v. *United States*, 502 U.S. 46, 59 (1991). In that circumstance, the law "requires that the conviction be vacated and the case retried." *United States* v. *Barona*, 56 F.3d 1087, 1098 (9th Cir. 1995); *accord United States* v. *Borrero*, 771 F.3d 973, 976-977 (7th Cir. 2014).

This Court's decision in *Barona*, *supra*, is instructive. There, two defendants were convicted of being principal administrators, organizers, or leaders of a continuing criminal enterprise, undertaken "in concert with five or more other persons with respect to whom [each defendant] occupies a position of organizer, a supervisory position, or any other position of management." 56 F.3d at 1096 (citation omitted). The government "produced an extensive list of individuals, allowing the jury to pick those it felt met the definition of supervisee," yet "[t]he jury was not instructed . . . that individuals qualify as supervisees only if they were those over whom [the defendants] exercised managerial responsibility." *Id.* at 1096-1097. And "among the list of people who the jury was told that it could choose, there existed individuals that the jury was not allowed to choose as a matter of law." *Id.* at 1097. Relying on the

Supreme Court's decision in *Griffin*, *supra*, this Court remanded for a new trial because it could not "tell whether the jury selected one of the purported supervisees who was actually ineligible." *Id.* at 1098.

The same is true here. The district court declined to instruct the jury that a false statement could be material only if the statement had the ability of influencing a decision other than an investigation into the truth of the statement itself. *See* 8-ER-1766–67. But one theory of materiality clearly presented by the government to the jury was that Congressman Fortenberry's statements were material to the government's decision to investigate the truth of those statements themselves.

The record contains evidence that the purpose of the Nebraska interview was to see whether Congressman Fortenberry would lie. One of the FBI agents who interviewed him (Agent Choe) testified that the purpose of the Nebraska interview was to "test his credibility" by "see[ing] what information, if any, the Congressman would provide about the June 4th, 2018, phone call" from Dr. Ayoub. 7-ER-1534–35. And in the memorandum used to obtain approval for that interview, another FBI agent (Agent Carter) wrote that, "if case agents determine from the interview that Fortenberry is making false statements[,] he will be charged with False Statement." 9-ER-2097.

The record also contains evidence that the FBI viewed Congressman Fortenberry's statements as important primarily because, in their view, they

were not truthful. The IRS agent who accompanied the FBI agents to Nebraska (Agent O'Leary) testified that the Congressman's statements in Nebraska were "significant to the [f]ederal investigation" because the "basis of asking and listening to the answers to those questions were to understand that they're false." 6-ER-1279. Agent Choe similarly testified that the Nebraska interview "heightened [the government's] concerns about the defendant . . . [b]ecause the statements that the defendant made during that interview were inconsistent with . . . the information that had been told to him by Elias Ayoub during the phone call." 6-ER-1391. As for the Washington interview, Agent Choe testified that, at that point, the government was "considering whether it would be appropriate to bring a false statements charge against" the Congressman. 6-ER-1392. Agent Choe added that the statements caused the government to perform additional investigative steps to see if the Congressman was telling the truth, such as "reviewing the defendant's FEC filings." 7-ER-1430, 7-ER-1450.

Based on the foregoing evidence, one of the governmental decisions on which the jury could have relied in making its materiality finding was the government's "decision to refer for investigation, investigate, or prosecute the defendant for the very statement at issue." *Litvak*, 808 F.3d at 173-174 (internal quotation marks omitted). As a matter of law, that decision cannot support a

materiality finding.  *See Griffin*, 502 U.S. at 59; *Barona*, 56 F.3d at 1098.  Because there is no way to know whether the jury found Congressman Fortenberry's statements material based on a decision that it was not allowed to consider as a matter of law, his convictions should be vacated.

## CONCLUSION

The judgment of the district court should be vacated, and the case remanded for further proceedings.

Respectfully submitted,

GLEN E. SUMMERS
BARTLIT BECK LLP
  *1801 Wewatta Street, Suite 1200*
  *Denver, CO 80202*

JOHN L. LITTRELL
BIENERT KATZMAN
  LITTRELL WILLIAMS LLP
  *903 Calle Amanecer, Suite 350*
  *San Clemente, CA 92673*

/S/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
WILLIAM T. MARKS
MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*

JING YAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

OCTOBER 28, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-50114

I am the attorney or self-represented party.

**This brief contains** | 12,491 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(•) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

   ( ) it is a joint brief submitted by separately represented parties;

   ( ) a party or parties are filing a single brief in response to multiple briefs; or

   ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Kannon K. Shanmugam | **Date** | 10/28/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 22-50144

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Kannon K. Shanmugam | **Date** | 10/28/2022
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 17** | *New 12/01/2018*