No. 22-50144

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

JEFFREY FORTENBERRY,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 21-491-SB*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

ALEXANDER P. ROBBINS
Assistant United States Attorney
Criminal Appeals Section

1000 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
(213) 894-2400
Alexander.P.Robbins@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                           **PAGE**

I.    INTRODUCTION ..................................................................... 1

II.   ISSUES PRESENTED ............................................................. 2

III.  STATEMENT OF THE CASE ................................................ 3

     A.   Jurisdiction, Timeliness, and Bail Status ............................ 3

     B.   Statement of Facts and Procedural History ......................... 3

          1.   Defendant receives $30,000 in illegal conduit contributions from a foreign national at a Los Angeles fundraiser ............................................................. 3

          2.   Defendant learns that the money at the Los Angeles fundraiser came from Chagoury ..................... 8

          3.   Defendant lies to the Los Angeles FBI agents investigating Chagoury ................................................ 13

          4.   Defendant is prosecuted and convicted ....................... 16

IV.  SUMMARY OF ARGUMENT ............................................... 20

V.   ARGUMENT ........................................................................ 22

     A.   The Jury was Properly Instructed on the Definition of Materiality .......................................................................... 22

          1.   Standard of review and district court's discretion to formulate jury instructions ...................................... 22

          2.   Defendant's additional proposed instruction was wrong and unnecessary ............................................... 24

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

B.    Defendant Was Properly Charged and Convicted in the Central District of California ................................................. 31

     1.    Standard of review ........................................................ 31

     2.    The district court correctly rejected defendant's venue challenge, consistent with the precedent of this Court and every other court of appeals to address the issue ........................................................ 33

          a.    The district court correctly ruled that the materiality element of a false-statements charge allows prosecution in the district of investigation ........................................................ 34

          b.    Venue was also proper because defendant's false communication continued into the Central District of California, as *Angotti* holds ................................................................... 40

          c.    A wall of circuit authority forecloses defendant's venue argument .............................. 50

     3.    Venue would be proper in the Central District of California under any potentially applicable standard ...................................................................... 57

VI.   CONCLUSION ................................................................. 62

# TABLE OF AUTHORITIES

**DESCRIPTION**                                            **PAGE(S)**

## Federal Cases

*Brogan v. United States*,
  522 U.S. 398 (1998) ................................................... 20, 24, 30

*Hyde v. United States*,
  225 U.S. 347 (1912) ................................................... 45, 54

*Johnston v. United States*,
  351 U.S. 215 (1956) ................................................... 37

*Kungys v. United States*,
  485 U.S. 759 (1988) ................................................... 24

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ................................................... 47

*Palliser v. United States*,
  136 U.S. 257 (1890) ................................................... 46

*Rogers v. Ingersoll-Rand Co.*,
  144 F.3d 841 (D.C. Cir. 1998) ................................................... 27

*Shaw v. United States*,
  580 U.S. 63 (2016) ................................................... 28

*Travis v. United States*,
  364 U.S. 631 (1961) ................................................... 44, 60

*United States v. Acosta-Gallardo*,
  656 F.3d 1109 (10th Cir. 2011) ................................................... 56

*United States* v. *Angotti*,
  105 F.3d 539 (1997) ................................................... passim

*United States v. Auernheimer*,
  748 F.3d 525 (3d Cir. 2014) ................................................... 41

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Brennan,*
452 F. Supp. 3d 225 (E.D. Pa. 2020) ....................................................57

*United States v. Cabrales,*
524 U.S. 1 (1998)........................................................................ passim

*United States v. Camick,*
796 F.3d 1206 (10th Cir. 2015)..........................................................28

*United States v. Candella,*
487 F.2d 1223 (2d Cir. 1973) .............................................................51

*United States v. Casch,*
448 F.3d 1115 (9th Cir. 2006)............................................................32

*United States v. Castillo-Mendez,*
868 F.3d 830 (9th Cir. 2017)..............................................................23

*United States v. Cervantes,*
542 F.2d 773 (9th Cir. 1976)..............................................................26

*United States v. Clinton,*
574 F.2d 464 (9th Cir. 1978)..............................................................38

*United States v. Coplan,*
703 F.3d 46 (2d Cir. 2012) .......................................................... passim

*United States v. Corona,*
34 F.3d 876 (9th Cir. 1994)................................................................41

*United States v. Garcia,*
854 F.2d 340 (9th Cir. 1988)..............................................................39

*United States v. Gaudin,*
515 U.S. 506 (1995).................................................................... passim

*United States v. George,*
420 F.3d 991 (9th Cir. 2005)..............................................................26

iv

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                            **PAGE(S)**

*United States v. Gonzalez,*
   683 F.3d 1221 (9th Cir. 2012) ................................................................. 58

*United States v. Heredia,*
   483 F.3d 913 (9th Cir. 2007) ........................................................... 22, 23

*United States v. Hicks,*
   217 F.3d 1038 (9th Cir. 2000) ................................................................ 26

*United States v. Job,*
   871 F.3d 852 (9th Cir. 2017) ........................................................... 23, 40

*United States v. John,*
   477 F. App'x 570 (11th Cir. 2012) ......................................................... 57

*United States* v. *Johnson,*
   19 F.4th 248 (3d Cir. 2021) ............................................................. 28, 29

*United States v. Johnson,*
   323 U.S. 273 (1944) .................................................................... passim

*United States v. Kennedy,*
   564 F.2d 1329 (9th Cir. 1977) ................................................................ 48

*United States v. King,*
   735 F.3d 1098 (9th Cir. 2013) ................................................................ 24

*United States v. Liew,*
   856 F.3d 585 (9th Cir. 2017) ................................................................. 23

*United States v. Litvak,*
   808 F.3d 160 (2015) ........................................................................... 28

*United States v. Lombardo,*
   241 U.S. 73 (1916) ...................................................................... 42, 54

*United States v. Lozoya,*
   982 F.3d 648 (9th Cir. 2020) ................................................................. 42

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

*United States v. Lukashov,*
   694 F.3d 1107 (9th Cir. 2012)............................................32, 41, 54, 61

*United States* v. *Marsh,*
   144 F.3d 1229 (9th Cir. 1998)............................................45, 47, 48, 53

*United States v. Medina de Perez,*
   799 F.2d 540 (9th Cir. 1986)........................................................25, 29

*United States v. Moran-Garcia,*
   966 F.3d 966 (9th Cir. 2020)................................................................32

*United States v. Nevils,*
   598 F.3d 1158 (9th Cir. 2010)............................................................32

*United States* v. *Oceanpro Industries,*
   674 F.3d 323 (4th Cir. 2012).....................................................passim

*United States v. Oreto,*
   37 F.3d 739 (1st Cir. 1994) ................................................................27

*United States v. Overaker,*
   766 F.2d 1326 (9th Cir. 1985)............................................................37

*United States v. Pace,*
   314 F.3d 344 (9th Cir. 2002)............................................49, 55, 56, 60

*United States v. Palma-Ruedas,*
   121 F.3d 841 (3d Cir. 1997) ................................................................39

*United States* v. *Peppers,*
   697 F.3d 1217 (9th Cir. 2012)........................................................23, 32

*United States v. Real Property 874 Gartel Drive,*
   79 F.3d 918 (9th Cir. 1996)................................................................48

*United States* v. *Ringer,*
   300 F.3d 788 (7th Cir. 2002).....................................................passim

vi

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

*United States v. Ripinsky,*
  109 F.3d 1436 (9th Cir. 1997)...............................................26

*United States v. Rodgers,*
  466 U.S. 475 (1984) .......................................................25, 29

*United States v. Rodriguez-Moreno,*
  526 U.S. 275 (1999) ................................................... passim

*United States v. Sablan,*
  114 F.3d 913 (9th Cir. 1997) ............................................26

*United States v. Salinas,*
  373 F.3d 161 (1st Cir. 2004) .........................................38, 53

*United States v. Schleibaum,*
  522 U.S. 945 (1997) .........................................................56

*United States v. Shipsey,*
  363 F.3d 962 (9th Cir. 2004).............................................28

*United States v. Smith,*
  641 F.3d 1200 (10th Cir. 2001).......................... 54, 55, 56, 61

*United States v. Stephenson,*
  895 F.2d 867 (2d Cir. 1990) .................................... 41, 54, 60

*United States v. Wells,*
  519 U.S. 482 (1997) .........................................................40

*United States v. Wiles,*
  102 F.3d 1043 (10th Cir. 1996).......................................56, 57

*Williams v. Fla.,*
  399 U.S. 78 (1970) ...........................................................32

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

## State Cases

*Massachusetts v. Macloon*,
  101 Mass. 1 (1869) .................................................................37

*Simpson v. State*,
  17 S.E. 984 (Ga. 1893) .........................................................37

## Constitutional Provisions

U.S. Const., art. III § 2, cl. 3 ......................................31, 32, 43

U.S. Const., amend. VI ..............................................................32

## Federal Statutes

18 U.S.C. § 924(c) .....................................................................35

18 U.S.C. § 1001.............................................................. passim

18 U.S.C. § 1014.............................................................. passim

18 U.S.C. § 2241(c).....................................................................41

18 U.S.C. § 3231...........................................................................3

18 U.S.C. § 3236.........................................................................37

18 U.S.C. § 3237..............................................21, 42, 43, 57

26 U.S.C. § 7212(a) ..................................................................47

28 U.S.C. § 1291...........................................................................3

## Other Authorities

Charles Alan Wright & Arthur R. Miller, *Federal Practice and
  Procedure* § 2552 (3d ed.).......................................................27

No. 22-50144

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

JEFFREY FORTENBERRY,
*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 21-491-SB

## GOVERNMENT'S ANSWERING BRIEF

# I

# INTRODUCTION

Defendant Jeffrey Fortenberry was a congressman who received illegal campaign contributions at a Los Angeles fundraiser. When federal agents based in Los Angeles investigated the contributions and questioned defendant about them, he lied and falsely denied knowing (1) that the contributions had been funneled to his campaign by a foreign national, which federal law prohibits, and (2) that the

contributors had not been publicly disclosed, which federal law requires. A jury convicted defendant of knowingly and willfully making false statements that were material to a federal agency.

This Court should affirm.

# II

## ISSUES PRESENTED

**A.** A statement is "material" if it has "a natural tendency to influence, or was capable of influencing, the decisions or activities of a government agency."  Did the district court permissibly exercise its discretion when it declined to give defendant's incorrect and confusing additional instruction, which would have told jurors that "to be material, a false statement must be capable of influencing a then-existing investigation or decision," and that "a false statement is not material merely because it causes the government to investigate the veracity (truth or falsehood) of the statement itself"?

**B.** If someone in one district makes a misstatement that materially affects a government investigation in another district, does venue for a false-statements prosecution lie in the district of investigation?

# III

# STATEMENT OF THE CASE

## A.    Jurisdiction, Timeliness, and Bail Status

The district court had jurisdiction over defendant's prosecution

under 18 U.S.C. § 3231.  This Court has jurisdiction over defendant's

appeal under 28 U.S.C. § 1291.

The district court imposed its sentence on June 28, 2022, and

entered its judgment on the docket the same day.  (1-ER-2–3).[1]

Defendant filed a timely notice of appeal the next day.  (9-ER-2099.)

Defendant was sentenced to two years of probation, including

community service, and fined $25,000; he is not in custody.

## B.    Statement of Facts and Procedural History

### 1.    *Defendant receives $30,000 in illegal conduit contributions from a foreign national at a Los Angeles fundraiser*

Defendant was a politician from Nebraska first elected to

Congress in 2004.  (7-ER-1571.)  He was involved with "In Defense of

Christians," or "IDC," a lobbying organization whose purpose was

---

[1] "CR" refers to the Clerk's Record in the district court, "ER" refers
to defendant-appellant's excerpts of record, and "AOB" refers to
defendant-appellant's opening brief.

protecting Christians and other religious minorities in the Middle East. (5-ER-805, 910–911.)  Defendant had both an interest in the issue and ties to the Catholic Lebanese community (and Middle Eastern Christian community more generally), including to the founder of IDC, Toufic Baaklini, and an IDC board member and prominent Lebanese Catholic in Los Angeles, Elias Ayoub.  (5-ER 805–818 (Baaklini testimony); 5-ER-1048–1054 (Ayoub testimony); *see also* 7-ER-1571–73 (testimony of Rep. Anna Eshoo of California, describing her background as an Assyrian Catholic and her relationship with defendant); AOB 5–6.)

The initial funding for IDC — "about $1.3 million" — came from Gilbert Chagoury, a foreign billionaire and Lebanese Christian who was close with Baaklini and Ayoub.  (5-ER-821–829, 1029–1035.)  In 2015, the FBI's Los Angeles–area office opened a public-corruption investigation into Chagoury's activities, including whether he was illegally donating to the campaigns of political figures in California and around the United States.  (4-ER-531, 536–37, 560–561 (discussing the background of the investigation and some of the political figures suspected of having received illegal contributions); *see also* 6-ER-1382–1383 (factual stipulation about the investigation read to the jury).)

In late 2015, defendant decided to hold a fundraiser in Los Angeles. His fundraising consultant, Alexandra Kendrick, explained defendant's thinking: he "was hopeful of being able to raise money from folks who supported the same type of ideals that he had of saving Christians in the Middle East." (5-ER-936.) "He had not been successful" at tapping into this particular group of supporters in the past, but defendant "was excited" at the prospect of having "a group of folks who were willing to financially . . . thank him for the good work that he had done." (5-ER-941.) Defendant introduced Kendrick to Baaklini, who had agreed to help him set up a fundraiser, and they discussed holding an event in either Los Angeles or Detroit, eventually settling on Los Angeles. (5-ER-846–847.) Baaklini then referred Kendrick to Ayoub — "a leader for the Lebanese community" in Los Angeles — "and asked him to do the fundraiser." (5-ER-849.)

The fundraiser was held in Glendale in February 2016 and was a success, raising $36,000 for defendant's re-election campaign. (5-ER-966–977.) That placed the event among the top four or five of the 40 fundraisers defendant held that year. (5-ER-976.) Defendant was "very happy" about the haul. (5-ER-967–969.) But behind the scenes,

there were problems. Kendrick had been unable to get a list of names of the people attending and donating to defendant's campaign, which she (on behalf of defendant) was required to do under federal election law. (5-ER-952.) Ayoub promised her in the days leading up to the event that "[w]e have so much commitment, about $22,000," but he was unable to respond to her repeated requests for the names of the donor-attendees. (5-ER-959.) He texted her: "It is hard to give you the names." (*Id.*) According to Kendrick, this was "not normal." (5-ER-958.) And it was a problem for her: in addition to names, defendant's campaign was required to report the address, occupation, and employer of each donor, and part of Kendrick's job was ensuring — on defendant's behalf — that donors were donating their own money (as opposed to being a "conduit" for someone else) and that no money was coming from a prohibited source like a "foreign national." (5-ER-952, 956; *see also* 6-ER-1118 (defense cross-examination) (defining "conduit contributions" as "taking someone else's money and forwarding it to a politician").)

Kendrick expressed her concerns to defendant: "I told Mr. Fortenberry that I was not able to get an RSVP list. . . . and because of that, I did not know, you know, where this money was coming from."

(5-ER-960.)  But defendant moved forward with the event.  (5-ER-961.)

Though a donation form "was part of the invitation," Kendrick had not

received completed forms from the host, Ayoub, or from Baaklini, who

was still "peripherally" involved.  (5-ER-955, 963–65.)  So she "set up a

table with the donation forms" at the event itself, hoping "to gather

folks' checks as they came in and get them to fill out that donation

form."  (5-ER-963.)  That plan failed too.  Somewhere between 30 and

40 people showed up to the event, and "many of the donors brought in

checks from other people" — "like a brother's check or their sister's

check or their, like, friend's check."  (5-ER-965.)  Kendrick was unable

to get "complete information," such as occupations and employers, for

some of the donors.  (*Id.*)  And even after the event was over, Kendrick

was unable to get this information from Ayoub, so she "did quite a bit of

Googling" in an attempt to fulfill defendant's reporting obligations.  (5-

ER-973.)  Defendant knew about her efforts.  (5-ER-974.)

As it turned out, almost all of the money came from one person,

with the individual "donors" as strawmen or conduits — and that one

person was Chagoury, who, as a foreign national, was not supposed to

be donating at all.  Baaklini and Ayoub helped: a week or two before the

fundraiser, Baaklini had received cash from Chagoury, and a couple days later met Ayoub in Los Angeles and handed him a brown bag with $30,000 in it. (5-ER-1059, 5-ER-850–851.) Ayoub then distributed this cash among the various people who were going to attend defendant's fundraiser. (5-ER-1070; *see also* 5-ER-932.) Baaklini had done this for Chagoury three times before, for three other politicians, to the tune of about $120,000. (5-ER-1061–1062.)

Defendant had his suspicions, too. The following week, he met Baaklini in person in Washington, D.C. They didn't talk for long, but defendant asked Baaklini "if there's anything wrong with the fundraiser." (5-ER-861.) Baaklini responded that "nothing was wrong" and then inquired why defendant had posed the question. (5-ER-863.) "[B]ecause," defendant replied, "the money came from . . . one family." (*Id.*) After that, defendant dropped the issue. (5-ER-863–864.)

### 2. *Defendant learns that the money at the Los Angeles fundraiser came from Chagoury*

A couple months later, in August 2016, FBI agents interviewed Ayoub at his home in Los Angeles and later at the U.S. Attorney's Office downtown. (5-ER-1087–1091.) The FBI was initially focused on Ayoub's donations to other political figures, but during the second

interview, he admitted what he had done for defendant's Los Angeles fundraiser and began cooperating with the investigation. (*Id.*; *see also* 4-ER-557–566.) A few months after that, in February 2017, the Los Angeles–based FBI agents also talked to Baaklini — who had supplied Ayoub with Chagoury's cash for defendant's fundraiser — and he, too, confessed. (5-ER-864–867; *see also* 5-ER-904–905, 925–926 (noting Baaklini was interviewed by the same case agent from Los Angeles); 4-ER-582–584 (case agent's testimony).) Neither Ayoub nor Baaklini told defendant they were talking to the FBI.

The investigation continued, focusing not only on Chagoury — the "financier behind all of it" (4-ER-543) — but also on the various political figures who had received his conduit campaign contributions. (4-ER-587–595 (recounting the course of the investigation in later 2016 and 2017); 5-ER-1089 (questioning Ayoub about other political figures); 4-ER-585–586 (questioning Baaklini about other political figures); 6-ER-1382–1383 (factual stipulation about the investigation); CR 18 at 3 n.4 & app. (citing or attaching cooperation agreements for Baaklini, Chagoury, Chagoury's "right-hand man" and "consigliere," Joseph

Arsan (4-ER-589; 6-ER-1225), and former Transportation Secretary Ray LaHood).)

A year later, in March 2018, defendant texted Ayoub: "Doctor, I hope you are well. Would you have time for a quick call soon? Thanks, Jeff." (5-ER-1093.) Defendant's message "came out of the blue," and Ayoub was surprised — it was "unique" for him to receive a text message from a Congressmember proposing to chat. (5-ER-1094.) Ayoub consulted with the FBI and did not respond to defendant until nine days later: "Sorry, Congressman. I was overseas for a conference. I would like very much to talk to you. What day and time is good for you after Easter, Pacific time?" (5-ER-1095–1096.) Following some additional back-and-forth, the two were able to talk on the phone in April 2018. (5-ER-1098.) The FBI case agent sat next to Ayoub during the call, which Ayoub put on speakerphone; the plan was to let defendant talk and to "[s]ee what he wanted." (4-ER-601–602; 5-ER-1098.)

Defendant wanted another fundraiser. He asked how Ayoub was doing, asked about his recent travel, and asked about "the community back in L.A." — referring to the "American Lebanese community and

the church community," some of whose members had attended defendant's 2016 Los Angeles fundraiser.  (5-ER-1101.)  Then, defendant asked if Ayoub could help him set up another one:  "Would there be an opportunity to come back and visit with the community again?"  "Is that a possibility? Could you consider that?"  "Would that be alright?"  (5-ER-1102–1103.)

Ayoub worked with the investigating FBI agents to plan a follow-up call with defendant and to determine what to say on that call.  The agents (and the local U.S. Attorney's Office) were continuing to investigate Chagoury and various political figures he was funneling money to, and they were "interest[ed] in finding out where the defendant fit in [their] investigation."  (4-ER-607.)  So they decided to use Ayoub to "inform Congressman Fortenberry that his campaign received an illegal campaign contribution" at the 2016 Los Angeles fundraiser, and to gauge "his reaction to that" information.  (4-ER-608–609; *see also* 4-ER-612, 641.)

The follow-up call happened on June 4, 2018 and lasted about ten minutes.  (4-ER-613–627; 9-ER-2059–2065 (transcript of the call).)  Ayoub told defendant that he and his friends would likely be able to

11

hold another fundraiser but that they would not be able to donate as much as they had in 2016, when Toufic Baaklini had supplied "thirty-thousand dollar[s] in cash to give to your campaign." (9-ER-2062.) Defendant's reaction to that information was telling. He stumbled over his words but forged ahead. "Uh, yeah, well, it's yeah, there's no problem," he said. (*Id.*) "I was just hopeful that, uh, we could, uh, oh, just have, uh some continuation of the, uh, fine generosity that you have given and I, I, just really appreciate it. It's just, very hard to raise money." (*Id.*) Moments later, Ayoub again referenced the money from the 2016 fundraiser in Los Angeles, noting that Baaklini had told him that "probably the money did come from Gilbert Chagoury." (9-ER-2062–2063.) Defendant again reacted without concern or surprise, launching, instead, into a discussion of the "movement in Congress" spurred by recent lobbying efforts on behalf of religious minorities abroad. (9-ER-2063.) He then returned to the subject of a new fundraiser, proposing "a small dinner." (*Id.*)

Ayoub agreed to that proposal and referred to Baaklini and Chagoury yet again: "maybe perhaps, you know, Toufic can ask Gilbert to give us some money to donate to you." (9-ER-2063–2064.) Defendant

once again soldiered on: "Mhmm, yes, well, I, I can certainly discuss that with him um, to, to, help, uh, you know gather an event for, the community or, in the meanwhile people want to contribute individually that would be great, so should I just ask him about that?" (9-ER-2064.) Ayoub responded, "it is up to you," but then reiterated that Chagoury had contributed funds in 2016: "Last time, you know, he did help me with thirty thousand dollar[s] cash, you know." (*Id.*) For a fourth time, defendant asked no questions and expressed no concern.

Later that same day, defendant texted Baaklini and asked to meet in person. (4-ER-634; 5-ER-903–904; 6-ER-1388.) He also called his election-law attorney, though he did not tell her anything about receiving $30,000 in conduit contributions from a foreign national. (4-ER-773–775.) Nor did he make any corrections to any of his 2016 campaign-finance filings. (4-ER-733–734.) And defendant never followed up with Ayoub about another Los Angeles fundraiser. (6-ER-1389.)

### 3. *Defendant lies to the Los Angeles FBI agents investigating Chagoury*

About nine months later, in March 2019, two of the FBI agents on the Chagoury investigation travelled from Los Angeles to Lincoln,

13

Nebraska, to interview defendant at his home. (6-ER-1231; *see also* 4-ER-652; 9-ER-2066 (listing the agents from Los Angeles).) They were looking for answers to a number of questions, including when defendant "first learn[ed] that his campaign had received illegal conduit" contributions, whether defendant "had received any illegal campaign contributions from any other sources," and whether he "did anything or promised to do anything in exchange for those contributions." (6-ER-1230.) They also wanted to learn more about defendant's relationships with Chagoury, Baaklini, and Ayoub. (*Id.*)

The agents first visited defendant's house in the afternoon, but defendant wasn't home, so they came back later that evening. (6-ER-1233; *cf.* AOB 10 ("nighttime interview").) Defendant had called two local police officers to his house; the local officers checked the FBI agents' credentials and, at defendant's request, stayed for the interview. (6-ER-1240.) The FBI agents asked defendant a series of questions about his 2016 Los Angeles fundraiser. (9-ER-2067–2072 (interview transcript).) Defendant pretended to be unsure who Ayoub was and quickly became defensive. (9-ER-2068–2069.) Nonetheless, he continued answering the agents' questions, and then decided — even

14

after being told "that lying to the FBI is illegal" (6-ER-1243) — to lie to them, falsely denying that he knew about the illegal conduit contributions at his 2016 Los Angeles fundraiser.  (2-ER-188–189 (verdict form).)

Following this interview, defendant obtained counsel (a former congressman from South Carolina), and through counsel contacted the FBI, which referred them to the U.S. Attorney's Office for the Central District of California, which was running the investigation.  (6-ER-1392, 1616.)  Defendant's counsel "reach[ed] out" to the U.S. Attorney's Office in Los Angeles (7-ER-1617–1618), and they set up a July 2019 meeting in Washington, D.C., as the most mutually convenient place among "South Carolina, California, Nebraska, [and] Washington."  (7-ER-1629.)  Defendant lied in that meeting, too, denying that he knew about the $30,000 illicit contribution.  (9-ER-2087–2088 (interview transcript); 2-ER-190–191 (verdict form).)  Defendant claimed it would have been "horrifying" if Ayoub had told him that Baaklini provided $30,000 in cash for defendant's campaign.  (9-ER-2088.)  Defendant did not know that the FBI had a recording of Ayoub telling him just that, to which defendant had expressed no horror.

### 4.    *Defendant is prosecuted and convicted*

Defendant was charged with one count of scheming to falsify or conceal material facts, in violation of 18 U.S.C. § 1001(a)(1), and two counts of making material false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2).  The scheme count (Count 1) covered defendant's conduct between June 2018 and July 2019; the false-statement counts (Counts 2 and 3) covered the March and July 2019 interviews, respectively.  He was convicted on all three counts.  (1-ER-2 (judgment); 2-ER-197–202 (indictment).)

Before trial, defendant moved to dismiss the indictment on the ground that venue was improper in the Central District of California. (CR 14.)  The district court rejected defendant's venue challenge in a written opinion, concluding that venue is proper for an 18 U.S.C. § 1001 charge in both the district where the false statement is originally made and in the district where the false statement was directed, following the decisions of the Second, Fourth, and Seventh Circuits.  (1-ER-112–118.)

At trial, after hearing all the evidence, the jury found on a special-verdict form that defendant's "congressional campaign had received illicit contributions at the Los Angeles Fundraiser in 2016," and that

Baaklini "had provided $30,000" in cash to Ayoub "to contribute to [defendant's] congressional campaign at the Los Angeles fundraiser in 2016." (2-ER-186 (verdict form for Count 1).) The jury further found that defendant knew these facts, that they were material, and that defendant "knowingly and willfully us[ed] a trick, scheme, or device to falsify, conceal, or cover [them] up." (*Id.*)

Specifically, this is what the jury found defendant lied about in the first (March 2019) interview (2-ER-188):

> 5. We, the Jury, further unanimously find in support of our verdict on Count Two that the defendant willfully made the following statements with knowledge the statements were false and intent to deceive, and that the statements were material (**check all that apply**):
>
> ✓ Defendant FORTENBERRY was not aware of Toufic Baaklini making any illegal contributions, directing anyone to conduct illegal contributions, or providing money to anyone else to conduct conduit campaign contributions.
>
> ✓ The individuals who contributed to the Los Angeles Fundraiser were all publicly disclosed.
>
> ✓ Every campaign contribution that defendant had received was publicly disclosed.

And this is what the jury found defendant lied about in the second (July 2019) interview (2-ER-190):



In its instructions to the jury, the district court defined

"materiality" based on the Supreme Court's decision in *United States v.*

*Gaudin*, 515 U.S. 506, 509 (1995), and this Court's Model Jury

Instruction 24.10 (citing cases):

> [The statement] had a natural tendency to influence or was
> capable of influencing the decisions or activities of a
> Government agency. The false statement need not have
> actually influenced the agency, and the agency need not rely
> on the information, in fact, for it to be material.

(8-ER-1927, 1928 (oral instructions); *see also* 1-ER-14, 15 (identical

written instructions).) The district court declined to give an *additional*

materiality instruction that defendant proposed:

> To be material, a false statement must be capable of
> influencing a then-existing investigation or decision. A false
> statement is not material merely because it causes the
> government to investigate the veracity (truth or falsehood) of
> the statement itself.

(1-ER-106.)  As the government pointed out, defendant's proposed addition was "misleading," unnecessary, and unsupported by precedent. (1-ER-107.)  After hearing defendant's argument (1-ER-32–33), the district court declined to give the additional instruction on the ground that it was not "an accurate statement of the law" (1-ER-34).

The jury was also instructed, over defendant's objection (1-ER-71–72), that defendant's scheme and false statements must have been "capable of having an effect or did have an effect within the Central District of California."  (8-ER-1930 (oral); *see also* 1-ER-16 (written); 2-ER-189, 191 (verdict form).)  As the district court explained, "the act of making a materially false statement occurs not only where the statement is made, but also where it is directed."  (1-ER-117.)

Defendant now appeals, challenging the district court's refusal to give his additional materiality instruction and the district court's denial of his motion to dismiss based on venue.  (AOB 1, 16–21.)[2]

---

[2] The government addresses defendant's arguments in this order because, as the district court noted, materiality is relevant to the venue question.  (1-ER-116.)

# IV

# SUMMARY OF ARGUMENT

**A.**  The jury was properly instructed on the definition of materiality, which requires that a false statement have "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (cleaned up).  There is no exception for lying to investigators, even when the investigators "disbelieve[] [the] falsehoods." *Brogan v. United States*, 522 U.S. 398, 402 (1998).  The question is whether the statement is one that, if believed, would have a tendency to affect the government's decisionmaking.  Defendant does not dispute any of this.  Instead, he argues that the district court was required to give — *in addition* to this correct, sufficient definition of materiality — an *ad hoc* instruction, which inaccurately stated that Section 1001 requires a "then-existing investigation" and unnecessarily and confusingly stated that a false statement is not material just because the government investigates it.  The district court was not required to give this additional instruction.

**B.**  Defendant was properly charged and convicted in the Central District of California.  The essential conduct prohibited by 18 U.S.C. § 1001 is making a false statement that is material to a government decisionmaker — which, as the district court explained, "requires consideration of both the statement and its potential effect."  (1-ER-116.)  The potential effects of defendant's false statements were in the Central District of California, because defendant's lies "were directed at federal investigative efforts occurring" there.  (1-ER-117.)

The district court's conclusion was consistent with longstanding venue principles, as well as the decisions of three courts of appeals.  As Congress provided when it enacted 18 U.S.C. § 3237, "the locality of a crime" that spans multiple districts "extend[s] over the whole area through which force propelled by an offender operates."  *United States v. Johnson*, 323 U.S. 273, 275 (1944).  And it is well established that that venue for a criminal communication is proper in both the sending and receiving districts.  That rule applies even when a false communication is first received in the sending district and then relayed to the receiving district, as this Court held in *United States* v. *Angotti,* 105 F.3d 539, 541–43 (1997).  Consistent with *Angotti*, three courts of

appeals have held — in cases involving false statements to federal investigators, as here — that prosecution under 18 U.S.C. § 1001 is appropriate in the district of investigation, even if the lies were told in person to visiting agents in another district. *See United States v. Coplan*, 703 F.3d 46, 78–79 (2d Cir. 2012); *United States* v. *Oceanpro Industries,* 674 F.3d 323, 329 (4th Cir. 2012); *United States* v. *Ringer,* 300 F.3d 788, 791–92 (7th Cir. 2002). Venue was proper in this case.

# V

# ARGUMENT

## A. The Jury was Properly Instructed on the Definition of Materiality

The district court did not abuse its discretion in declining to give defendant's additional, incorrect materiality instruction. (1-ER-34, 106.)

### 1. *Standard of review and district court's discretion to formulate jury instructions*

Whether to give a jury instruction and how to formulate the instruction are reviewed for abuse of discretion. *United States v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007) (en banc).

A proposed instruction must be "supported by law and ha[ve] foundation in the evidence." *Heredia*, 483 F.3d at 922. Even then, however, a defendant is "not entitled to the instructions of his choice." *United States v. Liew*, 856 F.3d 585, 598 (9th Cir. 2017). "If the instructions fairly and adequately cover the issues presented, the district court is given substantial latitude in tailoring jury instructions." *United States v. Peppers*, 697 F.3d 1217, 1220 (9th Cir. 2012) (internal quotation marks omitted).

Thus, to show that a district court abused its discretion by refusing to give an instruction, a defendant must establish three things: (1) that his proposed instruction was legally correct ("supported by law"); (2) that it had "some foundation" in the record; and (3) that it was not "adequately encompassed" by another instruction. *Liew*, 856 F.3d at 598. Even if a defendant establishes these, this Court can affirm "on any ground supported in the record," *United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017), and will not reverse if "the error was harmless," *United States v. Castillo-Mendez*, 868 F.3d 830, 835 (9th Cir. 2017).

23

### 2. Defendant's additional proposed instruction was wrong and unnecessary

In this case, as in *Gaudin*, "[t]he parties . . . agree on the definition of 'materiality':  The statement must have 'a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  515 U.S. at 509 (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988), alteration omitted).  (*See also* AOB 30, 43 (quoting *Gaudin*).)  Put more simply, the government must establish "why the requested information was important."  *Gaudin*, 515 U.S. at 508.  And as defendant concedes, "materiality does not require any actual effect on governmental decisionmaking."  (AOB 36.)  "[P]ropensity to influence is enough."  *United States v. King*, 735 F.3d 1098, 1108 (9th Cir. 2013).  Accordingly, the Supreme Court has rejected the argument that a "*disbelieved* falsehood" cannot be material, explaining that what matters is the "the *possibility* (as opposed to the certainty) of perversion" of a "governmental function," such as "an investigation."  *Brogan*, 522 U.S. at 402.

The jury was so instructed.  (*See* 8-ER-1927, 1928; 1-ER-14, 15.)  The questions, then, are whether defendant's proposed instruction was correct and necessary.  The answer to both is no.

24

The first sentence of defendant's instruction was incorrect. Again, this was defendant's proposed instruction:

> To be material, a false statement must be capable of influencing a then-existing investigation or decision. A false statement is not material merely because it causes the government to investigate the veracity (truth or falsehood) of the statement itself.

(1-ER-106.) On appeal, defendant does not even attempt to salvage the "then-existing investigation or decision" requirement that he argued for below. He avoids mentioning it at all. (*See* AOB 42–51; *see also* AOB 15–16 (quoting only the second sentence of his proposed instruction).) That is understandable, since no such requirement exists. Walking into an FBI office and "falsely accus[ing] a third party of a crime," for example, could violate Section 1001 even if there were no then-existing investigation of the person falsely accused. *United States v. Medina de Perez*, 799 F.2d 540, 543 (9th Cir. 1986) (citing *United States v. Rodgers*, 466 U.S. 475, 476 (1984)). Indeed, myriad false statements will precede — and often precipitate — investigation, including lies designed to obtain governmental benefits or to avoid tax payments. *See id.* (citing cases). And the concept of influencing a "then-existing . . . decision" (1-ER-106) makes no sense at all.

A party is "not entitled to an instruction that misstates the law." *United States v. George*, 420 F.3d 991, 1000 (9th Cir. 2005); *see also United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000) (rejecting proffered instructions because, among other things, they "were not legally accurate"). The fact that defendant's proposed instruction was wrong, and that neither Section 1001 nor any background definition of "materiality" contains a pending-proceeding requirement, is a sufficient basis to reject defendant's contention that the district court was required to give his instruction. *See, e.g., United States v. Ripinsky*, 109 F.3d 1436, 1441 (9th Cir. 1997) ("partially incorrect" instruction could be rejected, finding no plain error), *overruled on other grounds by United States v. Sablan*, 114 F.3d 913, 916 (9th Cir. 1997) (en banc); *United States v. Cervantes*, 542 F.2d 773, 778 (9th Cir. 1976) ("The first sentence of the foregoing proposed instructions is not the law of this circuit. The second paragraph is not the law of this circuit. Either reason alone justified the refusal of the instruction, in its entirety, and the district judge was required to reject this proposed instruction.").

Other circuits enforce the same rule. District courts are "under no obligation to tinker with [a] flawed proposed instruction until it [is]

legally acceptable," *Rogers v. Ingersoll-Rand Co.*, 144 F.3d 841, 845 (D.C. Cir. 1998), and "for rather obvious reasons," a defendant cannot deputize the judge "to edit a proposed instruction to delete the bad and preserve the good," *United States v. Oreto*, 37 F.3d 739, 749 (1st Cir. 1994). *See also* 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2552 (3d ed.) (general rule in civil cases is that "trial judge need not give a requested instruction if it is inaccurate or deficient in any respect"). Because defendant's proposed instruction was wrong, the district court did not abuse its discretion in rejecting it.

But in any event, the second part of defendant's proposed instruction — "[a] false statement is not material merely because it causes the government to investigate the veracity (truth or falsehood) of the statement itself" — was unsupported, unnecessary, and either incorrect or at least confusing. The district court's definition of materiality came straight from *Gaudin* and is undisputedly correct. Defendant's proposed addition appears in no case or rule. And nowhere below did defendant cite the authorities he now relies on, none of which contain defendant's proposed language anyway. (*See* 1-ER-106 (citing only *Gaudin*, which says nothing similar); *cf.* 8-ER-1765–1766 ("We

27

cited *Gaudin*. I think it does flow from that case, but . . . I have found no case dead on point, and I would have cited one if I had one.").) A district court has discretion to decline an admittedly unsupported addition to a well-established, correct, and legally sufficient instruction. Indeed, "[w]here the instruction actually given was legally sufficient, a defendant cannot successfully contend that declining to use his specific formulation was an abuse of discretion." *United States v. Shipsey*, 363 F.3d 962, 967 (9th Cir. 2004) (good-faith instruction), *abrogated on other grounds by Shaw v. United States*, 580 U.S. 63, 72 (2016).

Furthermore, defendant's primary legal argument in support of his supplemental instruction does not fit the facts of this case. He claims that the government cannot bootstrap materiality by arguing an unimportant lie caused the government to start investigating the lie itself, rendering the lie important after-the-fact. (*See* AOB 2 (labelling this a "circular theory"); *see also* AOB 43–45 (citing *United States* v. *Johnson,* 19 F.4th 248, 260–61 (3d Cir. 2021); *United States v. Litvak*, 808 F.3d 160, 173–74 (2015); *United States* v. *Camick,* 796 F.3d 1206, 1218–19 (10th Cir. 2015).) It is true that because materiality is evaluated "at the time the statement was made" (AOB 41), an

unimportant statement cannot later become material because federal agents decide they want to investigate the person who made it. *See Johnson,* 19 F.4th at 260 (noting that such a rule would "render the materiality element meaningless, and the scope of § 1001 absurd"). But a statement that is important when made — e.g., "[my] wife ha[s] been kidnap[p]ed," *Rodgers,* 466 U.S. at 477, or accusing a third-party of a crime, *Medina de Perez,* 799 F.2d at 543, or "I didn't know anything about Gilbert Chagoury funneling conduit contributions to American politicians" — does not become immaterial "because it causes the government to investigate the veracity of the statement itself." (1-ER-106; *see also* 8-ER-1961 (describing the significance of the investigation).) Thus, the second part of defendant's proposed instruction was either incorrect or at least inapplicable and confusing.

Moreover, there was no bootstrapping in this case, nor could there have been. Defendant's lies about his 2016 fundraiser and what he knew about it were important when they were told, not because they subsequently prompted "an investigation into the truth of the statement." (AOB 44.) He did not lie "about what [he] ate for breakfast" or his "true hair color," leading agents to decide he was

29

dishonest and start investigating him. (8-ER-1961 (government's closing argument, offering these examples of immaterial statements).)

Rather, there is no question that there was a pending investigation here. Three federal agents testified at length about that investigation. (3-ER-494–4-ER-764; 6-ER-1162–1342; 6-ER-1373–7-ER-1543.) The parties entered a stipulation about "the investigation." (6-ER-1382; *see also* AOB 7 (discussing "[t]hat investigation").) Defense counsel talked about the investigation in his closing argument. (8-ER-2003 ("The investigation in this case is operation Titan's Grip. That's an investigation into election interference.").) And the agents testified about what information they were looking for when they interviewed defendant. (6-ER-1230 (noting that the FBI was investigating, *inter alia*, whether defendant knew about the illegal conduit contributions at the time they were made, and whether he was agreeing to do anything in exchange for them); *see also* 8-ER-1962–1963 (government's closing)). In the context of such an investigation, a false "exculpatory no," *Brogan*, 522 U.S. at 401, was especially significant. (*See also* 4-ER-612 (noting the significance of defendant's reaction in the context of his call with Ayoub).) The agents asked defendant whether he knew his campaign

30

received illegal contributions in the context of a public-corruption investigation that had begun years earlier — there was no boot-strapping, or anything close.

Finally, even if defendant's proposed instruction had been legally sound and factually pertinent, it still would have been unnecessary, rendering any error in rejecting it harmless. The district court's correct *Gaudin* instruction allowed defendant to argue his materiality theory, and his materiality argument before the jury was cursory. (*See* 8-ER-2003–9-ER-2005.) Defendant rested his case on intent, arguing that the government had failed to prove beyond a reasonable doubt that he understood what Ayoub was telling him during their June 2018 phone call and did not think much about it afterwards. (8-ER-1980–1993.) The jury found otherwise. Defendant's incorrect and misplaced theory of materiality provides no basis to overturn that verdict.

## B. Defendant Was Properly Charged and Convicted in the Central District of California

The district court properly rejected defendant's venue challenge.

### 1. *Standard of review*

The Constitution requires criminal trials to "be held in the State where the said Crimes shall have been committed." U.S. Const., art.

III, § 2, cl. 3; *see also* amend. VI (jury vicinage); *Williams v. Fla.*, 399
U.S. 78, 93 & n.35 (1970). "[V]enue is not an element of the offense" but
a "question of fact that the government must prove by a preponderance
of the evidence." *United States v. Moran-Garcia*, 966 F.3d 966, 969 (9th
Cir. 2020). Legal questions underlying venue are reviewed de novo, but
factual questions are "for the jury, not the court" and thus reviewable
only to determine whether the evidence was sufficient to persuade any
rational juror under the preponderance standard. *United States v.
Lukashov*, 694 F.3d 1107, 1119–20 (9th Cir. 2012); *see also United
States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc)
(articulating sufficiency-of-the-evidence standard of review). Erroneous
jury instructions on venue are harmless if a correctly instructed jury
necessarily would have concluded that venue was established by a
preponderance of the evidence. *Moran-Garcia*, 966 F.3d at 969–70;
*Lukashov*, 694 F.3d at 1120; *United States v. Casch*, 448 F.3d 1115,
1118 (9th Cir. 2006). And, as always, the particular wording of a jury
instruction is reviewed only for abuse of discretion. *Peppers*, 697 F.3d
at 1220.

32

**2.** ***The district court correctly rejected defendant's venue challenge, consistent with the precedent of this Court and every other court of appeals to address the issue***

The district court correctly rejected defendant's pretrial venue challenge. First, as the district court explained, the essential conduct proscribed by 18 U.S.C. § 1001 is not only a false statement but a *material* one, meaning it affected or had the potential to affect a governmental decisionmaker — including in another district. Second, the district court's conclusion is consistent with longstanding venue principles governing criminal acts that span multiple districts, including communications that travel from one district to another, as this Court explained in *United States* v. *Angotti,* 105 F.3d 539, 541–43 (1997).[3] And third, three other courts of appeals — the Second, Fourth, and Seventh Circuits — have held in cases just like this one that an 18 U.S.C. § 1001 prosecution is proper in the district of investigation, even if the false statements were originally made in person to visiting investigators in another district. *See United States v. Coplan*, 703 F.3d

---

[3] The money-laundering holding in *Angotti* was overruled by *United States v. Cabrales*, 524 U.S. 1, 5 (1998), as discussed below, but the remainder of the decision remains binding precedent.

46, 78–79 (2d Cir. 2012); *United States* v. *Oceanpro Industries,* 674 F.3d 323, 329 (4th Cir. 2012); *United States* v. *Ringer,* 300 F.3d 788, 791–92 (7th Cir. 2002).

> ### a. *The district court correctly ruled that the materiality element of a false-statements charge allows prosecution in the district of investigation*

The district court, in its order below, correctly held that venue for defendant's crimes was proper in the Central District of California. (*See* 1-ER-112–118.)

The general test for determining where a crime takes place — the "*locus delicti*" — is based on "the nature of the crime alleged and the location of the act or acts constituting it." (1-ER-113 (quoting *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998)).) *See also Cabrales*, 524 U.S. at 6 (referring to this test as a "general guide"). As the district court explained, "[i]n performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." (1-ER-113 (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)).) The inquiry turns on where the "essential conduct" elements of the crime occurred, not necessarily where any "circumstance element" or

"anterior criminal conduct" occurred. (1-ER-113, 115 (quoting

*Rodriguez-Moreno*, 526 U.S. at 280 n.4).) So, for example, a defendant

who "engaged in the proscribed conduct of money laundering (which

occurred in Florida)" but "not drug trafficking (which occurred in

Missouri)" could not be prosecuted in Missouri, even though the funds

were obtained — by someone else — from drug trafficking in Missouri.

(1-ER-115 (summarizing *Cabrales*).) But a defendant who "used a gun

during a kidnapping" could be prosecuted in any district where the

kidnapping occurred, even if he had not used the gun there, because

both the gun-using and the kidnapping were essential-conduct elements

prohibited by 18 U.S.C. § 924(c). (1-ER-115 (summarizing *Rodriguez-*

*Moreno*).) As the district court put it, the "distinction drawn is clear:

the crime, for purposes of venue, is defined by the conduct Congress

sought to proscribe, and not by 'the anterior criminal conduct' that

formed the 'circumstance' giving rise to the prohibited conduct." (1-ER-

115.)

    Applying these principles to 18 U.S.C. § 1001, the district court

correctly concluded that "the act of making a materially false statement

occurs not only where the statement is made, but also where it is

directed." (1-ER-117.) The court rejected defendant's contrary argument, explaining that "an exclusive focus on the location where the false statement was made without regard to where it was directed gives short shrift to the prohibited conduct as contemplated by the statute." (1-ER-116.) The materiality element of Section 1001 "requires consideration of both the statement and its potential effect." (*Id.*) "Congress did not criminalize the act of making a false statement or the act of falsifying or concealing a fact." (1-ER-114.) "Absent materiality, a false statement is not conduct proscribed by law." (1-ER-117.) Accordingly, the district court concluded that "materiality is not a mere circumstance of the offense — it is the essence of the criminal conduct." (*Id.*) The district court further noted that while this Court "has not addressed the issue of venue in the context of Section 1001(a)," its holding was "consistent with the conclusion reached by a majority of courts that have considered the question," including *Coplan*, *Oceanpro Industries*, and *Ringer*, among others. (*Id.*)

The district court was right. Defendant's complaint that the district court's analysis improperly "shifted the focus of the venue analysis from the defendant's conduct" to "the conduct's potential

effects" simply fails to appreciate how the essential-conduct test works. (AOB 18.) Conduct is often defined by its effects. Shooting someone, for example, requires both a shot and an impact: defendant's exclusive focus on the former would lead to the counterintuitive proposition that a cross-border shooting could not be prosecuted in the district where the injury occurred. Courts have long held otherwise. *See, e.g.*, *Simpson v. State*, 17 S.E. 984, 985–86 (Ga. 1893) (defendant in South Carolina who shoots a victim in Georgia can be prosecuted in Georgia). Indeed, by statute, venue for federal murder and manslaughter prosecutions now exists "where the injury was inflicted," not where the action occasioning the injury was initiated, 18 U.S.C. § 3236, and, at common law, many crimes could be prosecuted wherever the defendant's act "continued to operate" or resulted in "injurious effect," *Massachusetts v. Macloon*, 101 Mass. 1, 5–8, 10 (1869). In some cases, the Supreme Court has even held that venue is proper *only* in the district where the harm or intended harm occurred. *See, e.g.*, *Johnston v. United States,* 351 U.S. 215, 220 (1956) (noting "the general rule that where the crime charged is a failure to do a legally required act, the place fixed for its performance fixes the situs of the crime"); *see also United States v.*

37

*Overaker*, 766 F.2d 1326, 1327 (9th Cir. 1985) (venue lay in Arizona where inmate was released in Minnesota and arrested in Missouri after failing to report to prison in Arizona).

There is therefore nothing anomalous about prosecuting a false statement based on "[t]he location of the government action that the statement could potentially influence." (AOB 30.) As the First Circuit noted, "[w]hen materiality is a critical component of the statutory definition, it makes perfect sense to consider the crime as continuing into the district in which the effects of the false statement are felt." *United States v. Salinas*, 373 F.3d 161, 166–67 (1st Cir. 2004).

Defendant is incorrect to argue that the place where the crime occurred — the *locus delicti*, *see* Black's Law Dictionary (11th ed. 2019) ("place of the wrong") — is categorically different from the location of "the crime's potential effects." (AOB 31.) It depends on the wrong. As the district court explained, "the locus delicti 'must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" (1-ER-113 (quoting *Cabrales*, 524 U.S. at 6–7); *see also* Black's Law Dictionary, *supra* (similar, quoting *United States v. Clinton*, 574 F.2d 464 (9th Cir. 1978)). Taking defendant's focus-only-

on-the-offender argument seriously would run counter not just to the reasoning of *Rodriguez-Moreno* but to its holding, too, since kidnapping is also defined in part by its effect on the victim. *See United States v. Garcia*, 854 F.2d 340, 343 (9th Cir. 1988) (discussing the unlawful-restraint element).

Defendant also misconstrues *Rodriguez-Moreno* when he contends that its discussion of "essential conduct elements" restricts venue in a Section 1001 prosecution to where the material false statement was "made," because only that element "define[s] the defendant's acts." (AOB 17, 27.) That is backwards. *Rodriguez-Moreno* used the phrase "essential conduct elements" to *expand* venue, rejecting the lower court's "verb test" that restricted venue (in that case) to "us[ing] a firearm" but not the underlying "crime of violence." 526 U.S. at 280; *see also United States v. Palma-Ruedas*, 121 F.3d 841, 864 (3d Cir. 1997) (Alito, J., dissenting in the decision below). Defendant attempts to resurrect the verb test here. Although the materiality element in 18 U.S.C. § 1001 is not phrased in the form of a verb, it is — as the district court explained — an "essential conduct element," because it involves defendant's conduct (i.e., what he actually does) and requires someone

39

to be on the receiving end of that conduct.  The materiality element necessarily "requires consideration of both the statement and its potential effect."  (1-ER-116.)  The district court therefore correctly concluded that venue was proper in the district of investigation, where the false statements were material.  (1-ER-116–117.)

> **b.** **Venue was also proper because defendant's false communication continued into the Central District of California, as** Angotti **holds**

Because the district court concluded that venue was proper based on the "essential conduct elements" of 18 U.S.C. § 1001 (1-ER-114–115), the court did not need to rely on the well-established rule that communications can span districts or apply this Court's holding in *Angotti*, 105 F.3d at 542, involving a false-statements statute, 18 U.S.C. § 1014, that contains no materiality element, *see United States v. Wells*, 519 U.S. 482, 490–99 (1997).  But the venue rule for communications, applied in *Angotti*, is another reason the district court was correct, and an alternate basis on which to affirm its decision.  *See Job*, 871 F.3d at 860.

*Cabrales* and *Rodriguez-Moreno* set forth a *locus delicti* test for relatively recent, complex statutory offenses (money laundering and

Section 924(c)),[4] but the longstanding background rule is that a criminal communication between districts can be prosecuted in either the sending or the receiving district. A defendant in Washington, D.C., for example, who extorts a victim in New York over the telephone, commits his crime in New York. *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990). And in this case, venue would obviously be proper if defendant's interviews had been over the telephone, with the agents in their offices in Los Angeles. Defendant accepts this background principle. (AOB 38 (citing *Stephenson* and attempting to distinguish "mail or telephone conversations" where "the speaker directed his statements to a person located in a different jurisdiction").)

As the Supreme Court has explained, Congress can "provide that the locality of a crime shall extend over the whole area through which force propelled by an offender operates." *United States v. Johnson*, 323 U.S. 273, 275 (1944). This "continuing offense" doctrine, *id.*, applies to crimes that "span space and time." *United States v. Corona*, 34 F.3d

---

[4] *See also, e.g.*, *United States v. Auernheimer*, 748 F.3d 525, 533 (3d Cir. 2014) (Computer Fraud and Abuse Act, 18 U.S.C. § 1030); *United States v. Lukashov*, 694 F.3d at 1121 (aggravated sexual abuse of a minor, 18 U.S.C. § 2241(c)).

876, 879 (9th Cir. 1994).  The doctrine is consistent with the rule that "where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *Rodriguez-Moreno*, 526 U.S. at 281 (quoting *United States v. Lombardo,* 241 U.S. 73, 77 (1916)).  In *Johnson*, as in *Lombardo*, the Supreme Court limited venue on statutory grounds, but invited Congress to "correct" any overly narrow venue rules "by legislation." *Lombardo*, 241 U.S. at 79.

Congress accepted this invitation and enacted 18 U.S.C. § 3237, expanding venue for "continuing offenses" to the constitutional limits articulated by the Court.  *See* Reviser's Note to 18 U.S.C. § 3237(a) (1948) (explaining that the statute was passed in response to the Court's decision in *Johnson*).  Recently, this Court held *en banc* that the second paragraph of § 3237(a) — applying to "any offense . . . involving transportation in interstate or foreign commerce" — covers discrete federal crimes (there, a slap in the face) committed at any point during an airplane flight, such that venue is proper in the district where the plane lands.  *United States v. Lozoya*, 982 F.3d 648, 653 (9th Cir. 2020) (en banc).

Defendant's description of Section 3237 as a "special venue statute" is therefore inapt. (AOB 37.) The purpose of Section 3237 was to *eliminate* the need for "special venue provisions[,] except in cases where Congress desires to restrict the prosecution of offenses to particular districts." Reviser's Note, *supra*. It eliminated the "restrictive approach" that defendant argues this Court should take. (AOB 25–26 (citing only *Johnson* as supporting this approach).) Under 18 U.S.C. § 3237, statutes defining crimes that span space or time no longer need a special venue provision. This is a general rule of construction to be applied across the criminal code, not a "special" provision that needs to be invoked by a court. (AOB 37.)

Contrary to the premise of defendant's argument, there is no "*locus delicti* test" or "analysis" (AOB 18, 27, 31, 33, 34, 37) that exists separate apart from "the special venue statute for continuing criminal offenses." (AOB 37–38.) *Locus delicti* just means "place of the wrong"; the government is not allowed to prosecute someone in a *locus* where the crime was not "committed." U.S. Const., art. III, § 2, cl. 3. But the point of Section 3237 is that courts will not read congressional silence in a particular criminal statute as an implicit limitation on venue when a

crime's commission spans multiple districts. (*Contra* AOB 36.) *See Johnson*, 323 U.S. at 275; *see also Travis v. United States,* 364 U.S. 631, 636 (1961) (but for a jurisdictional limitation on the part of the federal agency, venue for a false-mailing prosecution under 18 U.S.C. § 1001 could be "either at the sending or receiving end").

This Court applied that well-worn background rule in *Angotti*, a false-statements prosecution under 18 U.S.C. § 1014. The defendant there submitted a false loan application to a bank branch in the Northern District of California, which reviewed and conditionally approved the loan before relaying the application to the bank's office in the Central District of California for a final decision. *See* 105 F.3d at 541. This Court held that "venue was . . . proper in the Central District, where the communication reached the audience whom it was intended to influence, even though some of the criminal conduct occurred in the Northern District, where the statements were submitted." 105 F.3d at 542. *Angotti* thus treats false statements as continuing offenses prosecutable not only in the district where the statement is made but also in the district into which the statement is directed. *See Johnson*,

323 U.S. at 275 (the *locus* of a crime can "extend over the whole area through which force propelled by an offender operates").

*Angotti* is still binding precedent for false-statements prosecutions. Contrary to defendant's claims, this Court did not effectively overrule *Angotti* in *United States* v. *Marsh,* 144 F.3d 1229 (9th Cir. 1998), nor did *Cabrales* or *Rodriguez-Moreno* disturb its holding that a false communication begun in one district and relayed to a second district where the target lender assesses loans takes place in both districts. (*See* AOB 24–25, 39–40.)

As discussed above — and as explained by the district court — *Cabrales* and *Rodriguez-Moreno* did not involve communications at all. *Cabrales* held that money laundering can be prosecuted only where the money is laundered, not where the funds originally came from, unless the money-launderer "acquired the funds in one district and transported them into another" or conspired with someone in another district. *See* 524 U.S. at 7–8 (citing *Hyde v. United States*, 225 U.S. 347 (1912), for the conspiracy proposition). And *Rodriguez-Moreno* held that using a gun during a crime of violence can be prosecuted in any district where the crime of violence occurred, because Congress

45

"proscribed both the use of the firearm *and* the commission of acts that constitute a violent crime." 526 U.S. at 281. Indeed, the only one of these decisions to restrict venue — *Cabrales* — reiterated the rule that a criminal mailing from one district to another can be prosecuted anywhere the communication travelled. *See* 524 U.S. at 9 (citing *Palliser v. United States,* 136 U.S. 257, 266–68 (1890)). And the Supreme Court's discussion of the money-laundering offense charged in that case supports the conclusion that a criminal can be prosecuted in any district where the crime "move[s]." 524 U.S. at 9 ("The counts before us portray her and the money she deposited and withdrew as moving inside Florida only."). Defendant was not prosecuted for money laundering but for lying to investigators who were conducting a Central District of California investigation into his illegal fundraising in the Central District of California. That is why his lies were relayed to the Central District and could be prosecuted there.

Nor did *Marsh* overrule *Angotti*.[5] *Marsh* involved "[t]he filing of baseless liens to harass government officials," thereby "endeavoring to

---

[5] That would have been impossible. A three-judge panel cannot overrule a preceding three-judge decision absent clearly irreconcilable

(continued . . . .)

impede the IRS" in violation of 26 U.S.C. § 7212(a). 144 F.3d at 1234, 1241–42. The defendants filed the liens in Nevada and Washington but were prosecuted in the Northern District of California — the location of the IRS officers against whom the liens were filed. *Id.* at 1242. This Court held that venue did not lie in the Northern District because "endeavoring to impede the IRS is complete when the endeavor is made." *Id.* "No effect need be proved. The filing of the lien is the crime." *Id.* *Marsh* distinguished *Angotti* — and reaffirmed its venue holding — by pointing out that the 18 U.S.C. § 1014 offense in *Angotti* was "completed by the statement having effect." *Id.* That same distinction applies here. Defendant's 18 U.S.C. § 1001 offense was completed by his lies having an effect in the Central District of California, where he was under investigation.

The fact that a Section 1001 charge may be prosecuted even if the statement has no "actual effect on the government" (AOB 32) does not alter the venue analysis. A false statement in violation of Section 1014

_____

intervening authority, *see Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir. 2003) (en banc), and since *Marsh* was decided before both *Cabrales* and *Rodriguez-Moreno*, there was no intervening authority upon which it could have overruled *Angotti*.

also need not have any actual effect. Because that statute punishes false statements made "for the purpose of influencing" lenders, 18 U.S.C. § 1014, "[i]t is irrelevant whether a lending institution actually relies upon an allegedly false statement, so long as the statement . . . was *capable* of influencing the lending decision." *United States v. Real Property 874 Gartel Drive*, 79 F.3d 918, 922 (9th Cir. 1996) (per curiam). That was the rule long before *Angotti* and *Marsh*. *See United States v. Kennedy*, 564 F.2d 1329, 1340–41 (9th Cir. 1977) ("From the language of 18 U.S.C. s 1014 and the teaching of the cases, we hold that the essence of the offense in the making of the false statement with the intent to influence the lender is not dependent on the accomplishment of that purpose."). But even so, a false statement intended to influence a lender may be prosecuted in the district where the lender transmits the statement in assessing whether to fund the loan. *Angotti*, 105 F.3d at 544–45. By the same token, defendant's false statements were permissibly prosecuted in the district into which they were directed based on the government's ongoing investigation into his campaign finance violations in that district.

48

Resolution of this appeal requires no broader holding. No one is suggesting that Washington, D.C., would be an appropriate venue for every Section 1001 prosecution, because "the executive, legislative, [and] judicial branch[s] of the Government of the United States" are headquartered there. Rather, as this Court has held, "venue may lie only where there is a direct or causal connection," such as when a communication "originated, passed through, or was received" in a particular district. *United States v. Pace*, 314 F.3d 344, 349–50 (9th Cir. 2002) (additionally holding, in the context of wire fraud, that venue would be proper in the district from which the wire communication was "orchestrate[d]"). A "direct connection" is what the government argued below (CR 18 at 9, 15 ("direct result")), and is the only "effects test" at issue here. (AOB 18.)

In sum, because defendant's false statements continued into the Central District of California where he was under investigation for accepting illegal campaign contributions at a Central District of California fundraiser, venue was proper.

### c.    A wall of circuit authority forecloses defendant's venue argument

Three courts of appeals, the Second, Fourth, and Seventh Circuits, have held, consistent with the district court's analysis and with this Court's precedent, that venue for a Section 1001 prosecution is proper in the district where the false statements were ultimately received and had an effect. *Coplan*, 703 F.3d 46; *Oceanpro Industries,* 674 F.3d 323; *Ringer,* 300 F.3d 788.

While defendant acknowledges those cases, he makes no attempt to distinguish them, simply arguing that they were wrongly decided. (AOB 33–35.)  But it is defendant who is mistaken — these courts of appeals got it right, applying the well-worn venue principles discussed above to the very offense at issue in this case.

*Coplan* involved numerous defendants who created and marketed fraudulent tax shelters.  703 F.3d at 54.  One of them was later questioned by the IRS about these shelters in a deposition and lied.  But he lied outside of the Southern District of New York, which is where he was prosecuted — "his statements were both made and received during [an] IRS deposition in Nashville."  *Id.* at 78.  The defendant argued, based on many of the same authorities defendant relies on (including

50

*Rodriguez-Moreno* and *Cabrales*), that because his lies were told in-person to IRS agents in the Middle District of Tennessee, venue for his false-statements prosecution was only appropriate there. *Id.*

The Second Circuit explained why he was wrong, applying both the "continuing offense" analysis and the "essential conduct elements" test. The court began by recounting its precedents holding that false statements made in one district and "conveyed" to another district could be prosecuted "in both jurisdictions." *Id.* (citing *United States v. Candella*, 487 F.2d 1223 (2d Cir. 1973), which this Court followed in *Angotti*, 105 F.3d at 542). The court then concluded that the defendant's offense "began in Tennessee, where [he] made the false statements to IRS officials, but continued into the Southern District of New York, where his deposition transcript was reviewed and discussed by IRS officials in connection with the ongoing . . . audit." *Id.* at 80. The Second Circuit also rejected the argument that *Rodriguez-Moreno* changed that analysis: *Rodriguez-Moreno* instructed courts to look to the "essential conduct elements" when determining where a crime takes place, and "the essential conduct prohibited by § 1001(a)(2) is the making of a materially false, fictitious, or fraudulent statement." 703

51

F.3d at 79. Because whether the false statements "were material turn[ed] on the tendency or capacity of those statements to influence the decisionmaking body at issue" — "the IRS" — and because "the IRS investigators [were] working in the Southern District of New York" — venue was proper there. *Id.* *Coplan* recognized that there was no conflict between the "essential conduct elements" discussion in *Rodriguez-Moreno* and the rule that false communications across district lines continue into the receiving district. *See id.* at 79–80.

*Oceanpro Industries* and *Ringer* are similarly indistinguishable from this case. *Oceanpro Industries* involved corporate officers who made (in-person) false statements to out-of-district investigators, 674 F.3d at 327, and the Fourth Circuit likewise concluded that venue was proper in the district of investigation — reasoning that "the essential conduct prohibited by the statute is making any materially false statement," "that venue is appropriate where the effects of the defendant's conduct are felt when Congress has defined the essential conduct elements in terms of those effects," and that "venue is proper in the district where those prescribed effects would be felt." 674 F.3d at 329 (cleaned up). *Ringer* followed the same logic: a prisoner made false

52

statements to out-of-district federal investigators who visited him in

prison, 300 F.3d at 790, and the Seventh Circuit rejected the argument

that "the false statements began, continued, and were completed" in the

district where his prison was located, because "the investigation . . .

reasonably likely to be affected by" the false statements was in the

other district, *id.* at 791–92.

The district court in this case properly relied on *Coplan*, *Oceanpro*

*Industries*, and *Ringer*, as well as the First Circuit's decision in *Salinas*.

(1-ER-116–117.)[6]

Defendant quibbles with aspects of each of these three appellate

precedents foreclosing his position, but the thrust of his argument

against them appears to be that, under *Gaudin*, false statements to

visiting investigators do not need to be transmitted into the district of

---

[6] The district court relied on and quoted the part of the First Circuit's decision in *Salinas* addressing 18 U.S.C. § 1001 (1-ER-116), not *Salinas*'s disagreement with this Court's precedent in *Angotti* outside of the Section 1001 context, *see* 373 F.3d at 166–67, which wrongly concluded that *Angotti* had been overruled by *Marsh* and in any event could not bind the district court. In short, *Salinas* concluded that a Section 1001 false statement is more of a continuing offense than a Section 1014 false statement — the exact opposite of defendant's argument to this Court. (AOB 39–40.)

investigation in order to be material. (AOB 34–36 (citing *Gaudin* twice); *see also* AOB 32 ("the criminal act is completed as soon as the false statement of material fact is made").) That is true but irrelevant. An offense that spans districts "does not terminate merely because all of the elements are met" in the first district. *Lukashov*, 694 F.3d at 1121. Kidnapping takes place where the victim is first kidnapped, but it also takes place in any other district where the victim is taken. *See Rodriguez-Moreno,* 526 U.S. at 281. A conspiracy with overt acts in multiple districts takes place in multiple districts, even if only one overt act would be necessary to sustain a conviction. *Id.* at 281–82 (citing *Hyde*, 225 U.S. at 356–67); *see also Lombardo,* 241 U.S. at 77 ("where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done"). And, as noted, even defendant acknowledges the general rule that a communication takes place in the district where it is received. (AOB 38 (citing *Stephenson*, 895 F.2d at 874, *inter alia*).)

The one arguable out-of-circuit precedent defendant has on his side is *United States v. Smith,* 641 F.3d 1200 (10th Cir. 2001), though that case is sufficiently distinguishable from this one that defendant

54

drops a lengthy footnote disagreeing with part of its reasoning. (AOB 29 n.*.) Defendant's concern is warranted, because *Smith* specifically noted that the false statements at issue were made in Minnesota and were "not recorded, transcribed, or otherwise preserved for use in Oklahoma," where the defendant was prosecuted. 641 F.3d at 1209. They thus had no effect on the district. That much of *Smith* is consistent with *Angotti*: a false statement must continue (or at least be directed) into a second district in order to be prosecuted in that district. *See Angotti*, 105 F.3d at 541 ("venue was . . . proper in the Central District, where the communication reached the audience whom it was intended to influence"); *cf. Pace*, 314 F.3d at 349–50 ("venue may lie only where there is a direct or causal connection," such as when a communication "originated, passed through, or was received" in a particular district). *Smith* is also consistent with *Cabrales*' statement that criminal conduct can be prosecuted in another district only if it "move[s]" in that district. 524 U.S. at 9. And *Smith* reaffirmed its own circuit's precedent that "that giving a false statement may be a continuing offense, where the statement is 'made' in more than one district," citing a case where a defendant mailed a false document from

one district to another.  641 F.3d at 1209 (citing *United States v. Wiles*,

102 F.3d 1043, 1064 (10th Cir. 1996), *vacated on other grounds*

*by United States v. Schleibaum*, 522 U.S. 945 (1997)).

The key holding of *Smith* is its rejection of "a 'substantial contacts'

test" that would allow a false-statements prosecution based on the

*content* of the statements — i.e., the theory that venue would be proper

in a district because the statements at issue merely "conveyed events

that occurred in" that district.  641 F.3d at 1208; *see also United States*

*v. Acosta-Gallardo*, 656 F.3d 1109, 1121 (10th Cir. 2011) (citing *Smith*

for that proposition).  But no one is advocating for such a broad

standard here; the government does not contend that it could prosecute

defendant in Arizona because he lied to investigators in Los Angeles

about a fundraiser in Scottsdale.  *See Pace*, 314 F.3d at 349–50

(requiring "a direct or causal connection").

To be sure, *Smith* may have been overbroad in its language,

pronouncing generally that "the *locus delecti*" of a Section 1001 violation

"is where the defendant makes the false statement."  641 F.3d at 1207.

(*See also* AOB 28.)  But it cannot categorically be true that a defendant

"makes" a false statement only in the district where he moves his

56

mouth or types on his keyboard. The Tenth Circuit's own precedent says otherwise. *See Wiles*, 102 F.3d at 1064 (applying the continuing-offense doctrine and 18 U.S.C. § 3237 in a false-statements case).[7] And as discussed above, the *locus delicti* for communications exists in both the sending and receiving districts unless limited by statute, and 18 U.S.C. § 3237 clarifies that courts should not read statutory silence as containing any such limitation. Defendant's lies in this case continued into the Central District.

### 3. Venue would be proper in the Central District of California under any potentially applicable standard

The record amply supported the jury's finding, by a preponderance of the evidence, that defendant's material false statements and omissions were "capable of having an effect or did have an effect within the Central District of California." (8-ER-1930.) There is no merit to

---

[7] Defendant also cites (AOB 29–30) an 11-year-old, non-precedential Eleventh Circuit decision, *United States v. John*, 477 F. App'x 570 (11th Cir. 2012), which suffers from this same erroneous fixation on the specific statutory verbs. The district court in *United States v. Brennan*, 452 F. Supp. 3d 225 (E.D. Pa. 2020), pointed out this error in rejecting essentially the same argument advanced by defendant. *See id.* at 235–36 & n.9. It also appears that the Eleventh Circuit has not relied on (or even cited) its unpublished decision in the decade since it was issued.

defendant's attempt (on appeal) to draw a distinction between that standard and whether his false statements were "directed at" the Central District. (AOB 39.) But under any potential standard — whether "directed at" or any of the tests from other circuits, including the Tenth Circuit in *Smith* — venue would be proper in this case.

The district court's instruction — whose wording defendant never contested, other than to argue that it should not be given at all — properly adapted venue principles to the particular elements of 18 U.S.C. § 1001. And the evidence at trial proved that defendant's false statements were both capable of having an effect in the Central District of California (at the time they were made (AOB 41)) and actually did have such an effect. The investigators travelled to Nebraska (and later to Washington, D.C.) from the Central District. (6-ER-1231; 4-ER-652; 9-ER-2066 (listing the agents from Los Angeles).) Although defendant did not need to know that they were from Los Angeles for venue purposes, *see United States v. Gonzalez*, 683 F.3d 1221, 1226 (9th Cir. 2012), he did know, learning (and complaining about) that fact at the beginning of the first interview. (6-ER-1243; 7-ER-1619.) Thereafter, defendant's counsel reached out to the U.S. Attorney's Office in Los

Angeles "north of a dozen times" to provide information related to the investigation. (7-ER-1617–1620.) There was also testimony about what the investigating agents were looking for when they interviewed defendant: each area of inquiry necessarily implied an effect on their Los Angeles–based investigation. (6-ER-1230.) And an agent testified about how, after both interviews, defendant's false statements had caused further investigatory activity in the Central District of California. (7-ER-1450–51.) That agent even testified that he and the other agent took the recordings of defendant's false statements back to "the Central District," where they "reviewed," "transcribed," and "analyzed" them. (7-ER-1451.)

As the prosecutor put it, arguing before the district court that the evidence was sufficient, "it's been clear that the Federal investigation we're talking about is in the Central District of California." (7-ER-1552.) There was no disagreement about that. The federal investigation of Chagoury and others, including defendant (6-ER-1382–1383 (factual stipulation)), "originated in the Central District of California and was investigated by the FBI, U.S. Attorney's Office, and IRS in the Central District of California for six years. That [was] the

home and the only home of this investigation." (8-ER-1965 (government closing argument).) As defense counsel put it, the government's evidence was that "after we recorded his statements in Washington D.C. and after we recorded his statements in Nebraska, then we took them back to California and then we analyzed them there and we made some decisions there." (9-ER-2005–2006.) Defense counsel complained to the jury about a lack of specificity in the evidence regarding what analyses were performed and what decisions were made (9-ER-2006), but counsel could not contest the underlying point that whatever effect any false statements had or were capable of having would have been in the Central District.

Moreover, any error in the precise formulation of the venue instruction was harmless. Venue was proper under any conceivable formulation of the test. Defendant's false statements were "directed" into the Central District (1-ER-117); they were "receiv[ed]" in the Central District, *Travis*, 364 U.S. at 636; they were "propelled" into the Central District, *Johnson*, 323 U.S. at 275; they "reached" the Central District, *Angotti*, 105 F.3d at 542; they "reached into" the Central District, *Stephenson*, 895 F.2d at 874; and they "direct[ly]" and

"causal[ly]" affected the Central District, *Pace*, 314 F.3d at 349–50. They even were "transport[ed] . . . across state lines" and "recorded, transcribed, [and] preserved for use" in the Central District. *Smith*, 641 F.3d at 1208–09. Indeed, the district court would have been justified in taking the issue from the jury and deciding it as a matter of law. *Lukashov*, 694 F.3d at 1119. Once the court properly rejected defendant's argument that the *locus delicti* of a false communication is only where the communication is made — as opposed to where it is directed or received — no rational trier of fact could have found that venue was not proper in the Central District of California.

# VI

# CONCLUSION

Defendant's convictions should be affirmed.

DATED: January 27, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

*s/ Alexander P. Robbins*

ALEXANDER P. ROBBINS
Assistant United States Attorney
Deputy Chief, Criminal Appeals
Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, under Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal that is not identified in the appellant's brief.

## CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 11,875 words, including 182 words manually counted in images and excluding the portions exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: January 27, 2023             *s/ Alexander P. Robbins*

ALEXANDER P. ROBBINS
Attorney for Plaintiff-Appellee
UNITED STATES OF AMERICA